No. 25-30524

# In the United States Court of Appeals for the Fifth Circuit

———————————————————

BRET BODIN; BRAD NEWELL; DARIAN MORGAN; MICHAEL ROSAS; MID-CITY MIKE RENTALS, L.L.C.; AIRBNB, INC.,
*Plaintiffs - Appellants,*

*v.*

NEW ORLEANS CITY,
*Defendant - Appellee.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

———————————————————

**PRINCIPAL BRIEF FOR PLAINTIFFS-APPELLANTS
BRET BODIN, BRAD NEWELL, DARIAN MORGAN, MICHAEL
ROSAS, MID-CITY MIKE RENTALS, L.L.C., AND AIRBNB, INC.**

———————————————————

Sarah E. Harrington
David M. Zionts
Alexander A. Berengaut
Daniel G. Randolph
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC  20001-4956
(202) 662-6000

Paul D. Clement
Andrew Lawrence
Mitchell K. Pallaki
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

November 12, 2025

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

No. 25-30524, *Bret Bodin; Brad Newell; Darian Morgan; Michael Rosas; Mid-City Mike Rentals, L.L.C.; Airbnb, Inc. v. New Orleans City*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. Plaintiffs-Appellants:

Bret Bodin; Brad Newell; Darian Morgan; Michael Rosas; Mid-City Mike Rentals, L.L.C.; Airbnb, Inc.

Airbnb, Inc., has no parent corporation and there is no publicly held corporation owning ten percent (10%) or more of its stock.

2. Defendant-Appellee:

City of New Orleans.

3. Counsel for Plaintiffs-Appellants:

Mark Cunningham; Madeline Melissa Freese/Jones Walker, LLP;

Sarah Harrington; Alex Berengaut; David Zionts; Daniel Randolph; Jeffrey Davidson/Covington & Burling LLP;

i

Paul Clement; Andrew Lawrence; Mitchell K. Pallaki/Clement & Murphy PLLC.

4. Counsel for Defendant-Appellee City of New Orleans:

Sean Michael Markey; Corwin St. Raymond; Donesia Turner; Sherri Hutton/City of New Orleans.

s/Paul D. Clement
Paul D. Clement

*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants request oral argument and believe it would assist the Court in addressing the significant constitutional and statutory issues presented in this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................. iii

TABLE OF AUTHORITIES ............................................................... vi

INTRODUCTION .......................................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 4

ISSUES PRESENTED ......................................................................... 5

STATEMENT OF THE CASE .............................................................. 5

    A.    The Longstanding Tradition of Short-Term Rentals ............. 5

    B.    Congress's Protection for Online Platforms for Third-Party Content Posted Online ............................................. 9

    C.    The City's Severe Restrictions on Short-Term Rentals ........ 10

        1.    The 2017 and 2019 Ordinances ................................. 10

        2.    The 2023 Ordinance ................................................. 11

        3.    The 2024 Ordinance ................................................. 15

    D.    This Litigation ................................................................. 16

SUMMARY OF THE ARGUMENT ........................................................ 18

STANDARD OF REVIEW .................................................................. 21

ARGUMENT ................................................................................. 21

I.    New Orleans' 2023 Ordinance Violates The Takings Clause ....... 21

    A.    The 2023 Ordinance Effects *Per Se* Takings ....................... 22

    B.    New Orleans' 2023 Ordinance Also Effects Regulatory Takings ........................................................................... 39

II.     The 2024 Ordinance Violates Section 230 ....................................44

    A.     Section 230 Preempts Laws Requiring Online
        Platforms to Monitor, Alter, or Delete Third-Party
        Online Content ...................................................................46

    B.     The 2024 Ordinance Violates Section 230 by Requiring
        Airbnb to Monitor, Alter, and Delete Third-Party
        Content ...............................................................................50

    C.     The District Court Misapplied Section 230 .........................55

CONCLUSION ....................................................................................67

CERTIFICATE OF SERVICE.............................................................68

CERTIFICATE OF COMPLIANCE .....................................................69

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*A.B. v. Salesforce, Inc.*,
123 F.4th 788 (5th Cir. 2024) ....................10, 19, 21, 44, 45, 46, 47, 48, 49, 50, 51, 52, 54, 56, 59, 62

*Airbnb, Inc. v. City of Boston*,
386 F.Supp.3d 113 (D. Mass. 2019)................................................55, 56

*Airbnb, Inc. v. City of New York*,
373 F.Supp.3d 467 (S.D.N.Y. 2019)....................................................65

*Alexander v. Harris*,
8 U.S. (4 Cranch) 299 (1808) ........................................................6, 25

*Armstrong v. United States*,
364 U.S. 40 (1960)........................................................................22, 43

*Barnes v Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009)............................................................63

*Barrere v. Shuber*,
5 La. App. 67 (1926) ..........................................................................25

*Butler v. Jones*,
21 So. 2d 181 (La. Ct. App. 1945).......................................................7

*Cal. Democratic Party v. Jones*,
530 U.S. 567 (2000) ...........................................................................29

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) ......................................................53, 63

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003)............................................................62

*Casitas Mun. Water Dist. v. United States*,
543 F.3d 1276 (Fed. Cir. 2008) .........................................................28

*Cedar Point Nursery v. Hassid,*
    594 U.S. 139 (2021) ........................... 2, 8, 22, 25, 27, 29, 31, 34, 37, 39

*Cienega Gardens v. United States,*
    331 F.3d 1319 (Fed. Cir. 2003) .................................................... 32, 34

*City of Eugene v. FCC,*
    998 F.3d 701 (6th Cir. 2021) ....................................................... 49, 61

*The Civil Rights Cases,*
    109 U.S. 3 (1883) ...................................................................... 8, 25, 37

*Curley v. Dean,*
    4 Conn. 259 (1822) ............................................................................. 6

*Doe 1 v. Twitter, Inc.,*
    148 F.4th 635 (9th Cir. 2025) ..................................................... 52, 63

*Doe v. Grindr Inc.,*
    128 F.4th 1148 (9th Cir. 2025) ........................................................ 63

*Doe v. MySpace, Inc.,*
    528 F.3d 413 (5th Cir. 2008) ...................................................... 47, 48

*Dolan v. City of Tigard,*
    512 U.S. 374 (1994) ......................................................................... 30

*Donaher, III v. Vannini,*
    2017 WL 4518378 (Me. Super. Ct. Aug. 18, 2017) ............................. 55

*Elk Point Country Club Homeowners' Ass'n*
    *v. K.J. Brown, LLC,*
    515 P.3d 837 (Nev. 2022) ................................................................. 38

*Faretta v. California,*
    422 U.S. 806 (1975) ......................................................................... 30

*Faw v. Marsteller,*
    6 U.S. (2 Cranch) 10 (1804) ......................................................... 6, 25

*Force v. Facebook, Inc,*
    934 F.3d 53 (2d Cir. 2019) ............................................................... 49

*Forshee v. Neuschwander,*
914 N.W.2d 643 (Wis. 2018) ............................................................... 38

*Garrison v. City of New York,*
88 U.S. (21 Wall.) 196 (1874) ............................................................. 26

*Google, Inc. v. Hood,*
822 F.3d 212 (5th Cir. 2016) .............................................................. 48

*Greater Las Vegas Short-Term Rental Ass'n*
*v. Clark Cnty.,*
2025 WL 2608146 (D. Nev. Aug. 28, 2025) .................................. 54, 55

*Green v. Am. Online (AOL),*
318 F.3d 465 (3d Cir. 2003) ............................................................... 62

*Hearts Bluff Game Ranch, Inc. v. United States,*
669 F.3d 1326 (Fed. Cir. 2012) .......................................................... 28

*Heights Apartments, LLC v. Walz,*
30 F.4th 720 (8th Cir. 2022) .............................................................. 40

*Herbert v. Wren,*
11 U.S. (7 Cranch) 370 (1813) ............................................................. 6

*Hignell-Stark v. City of New Orleans,*
154 F.4th 345 (5th Cir. 2025) .............................................. 12, 14, 37

*Hignell-Stark v. City of New Orleans,*
46 F.4th 317 (5th Cir. 2022) ............................................................. 11

*Hodel v. Irving,*
481 U.S. 704 (1987) ......................................................... 33, 34, 42, 43

*HomeAway.com v. Santa Monica,*
918 F.3d 676 (9th Cir. 2019) ............................. 20, 46, 56, 57, 58

*Horne v. Dep't of Agric.,*
576 U.S. 350 (2015) ............................................................................ 31

*Horton v. Handvil,*
3 A. 72 (N.J. Ch. 1886) ...................................................................... 25

*Jackson ex dem. Russell v. Rowland*,
   6 Wend. 666 (N.Y. Sup. Ct. 1831)................................................... 6

*Jane Doe No. 1 v. Backpage.com, LLC*,
   817 F.3d 12 (1st Cir. 2016) ...................................................... 49, 62

*Kohl v. United States*,
   91 U.S. 367 (1875)..................................................................... 26

*La Park La Brea A LLC v. Airbnb, Inc.*,
   285 F.Supp.3d 1097 (C.D. Cal. 2017)............................................. 55

*Lake Serene Property Owners Ass'n v. Esplin*,
   334 So.3d 1139 (Miss. 2022) ...................................................... 38

*Lingle v. Chevron*,
   544 U.S. 528 (2005)............................................... 4, 22, 33, 39

*Lucas v. S.C. Coastal Council*,
   505 U.S. 1003 (1992)................................................................. 43

*Lynch v. United States*,
   292 U.S. 571 (1934)................................................................... 39

*M.P. by & through Pinckney v. Meta Platforms Inc.*,
   127 F.4th 516 (4th Cir. 2025) .................................................. 49, 53

*McClelland v. Katy Indep. Sch. Dist.*,
   63 F.4th 996 (5th Cir. 2023) ...................................................... 64

*McFadden v. United States*,
   576 U.S. 186 (2015).................................................................. 35

*Muller v. Reynolds*,
   26 So. 2d 498 (La. Ct. App. 1946)................................................. 7

*Murr v. Wisconsin*,
   582 U.S. 383 (2017).............................................................. 42, 44

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
   53 F.4th 869 (5th Cir. 2022) ...................................................... 21

ix

*Nat'l Rifle Ass'n v. Vullo,*
   602 U.S. 175 (2024) ..................................................... 62

*Pandharipande v. FSD Corp.,*
   679 S.W.3d 610 (Tenn. 2023) ....................................... 38

*Pelletreau v. Jackson ex dem. Varick,*
   11 Wend. 110 (N.Y. Sup. Ct. 1833) ............................... 6

*Pinehaven Plan. Bd. v. Brooks,*
   70 P.3d 664 (Idaho 2003) ............................................ 38

*Pumpelly v. Green Bay Co.,*
   80 U.S. (13 Wall.) 166 (1871) ...................................... 33

*Reeves v. Dougherty,*
   15 Tenn. (7 Yer.) 222 (1834) ........................................ 7

*Richmond Elks Hall Ass'n*
   *v. Richmond Redevelopment Agency,*
   561 F.2d 1327 (9th Cir. 1977) ...................................... 33

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
   487 U.S. 781 (1988) ............................................. 29, 66

*Rock v. Arkansas,*
   483 U.S. 44 (1987) ....................................................... 29

*Rodrigue v. Rodrigue,*
   218 F.3d 432 (5th Cir. 2000) ....................................... 24

*Ruckelshaus v. Monsanto Co.,*
   467 U.S. 986 (1984) .............................................. 37, 41

*Sekhar v. United States,*
   570 U.S. 729 (2013) .................................................... 35

*Sharp v. Zeller,*
   38 So. 449 (La. 1905) .................................................... 7

*Sheetz v. Cnty. of El Dorado,*
   601 U.S. 267 (2024) ..................... 22, 23, 31, 32, 35

x

*Sherlock v. Thayer,*
    4 Mich. 355 (1856) ................................................................... 25

*Skinner v. Ry. Lab. Executives' Ass'n,*
    489 U.S. 602 (1989) ................................................................ 65

*Slaby v. Mountain River Ests. Residential Ass'n,*
    100 So.3d 569 (Ala. Ct. Civ. App. 2012) ............................... 38

*Smith v. Airbnb, Inc.,*
    316 Or. App. 378 (2021) ......................................................... 55

*Smith v. Maryland,*
    442 U.S. 735 (1979) ................................................................ 65

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ................................................................ 66

*State v. City Sav. Bank & Tr. Co.,*
    127 So. 890 (La. 1930) ............................................ 1, 8, 24, 41

*Terrace v. Thompson,*
    263 U.S. 197 (1923) ..................................................... 1, 8, 24

*Thompson v. Moran,*
    19 La. App. 343 (1932) ........................................................... 25

*Tondro v. Cushman,*
    5 Wis. 279 (1856) .................................................................... 25

*Twitter, Inc. v. Taamneh,*
    598 U.S. 471 (2023) ................................................................ 50

*Tyler v. Hennepin Cnty.,*
    598 U.S. 631 (2023) ....................................... 9, 23, 25, 38

*U.S. Tr. Co. of N.Y. v. New Jersey,*
    431 U.S. 1 (1977) .................................................................... 34

*Union Carbide Corp. v. Alexander,*
    679 S.W.2d 938 (Tenn. 1984) ................................................ 30

*United States v. Gen. Motors Corp.,*
323 U.S. 373 (1945) ............................................................... 26

*United States v. Petty Motor Co.,*
327 U.S. 372 (1946) ............................................................... 26

*Va. Hosp. & Healthcare Ass'n v. Roberts,*
671 F.Supp.3d 633 (E.D. Va. 2023) .................................... 28

*X Corp. v. Bonta,*
116 F.4th 888 (9th Cir. 2024) ............................................. 66

*Zeran v. Am. Online, Inc.,*
129 F.3d 327 (4th Cir. 1997) ....................................... 10, 47

## Constitutional Provision

U.S. Const. amend. V ............................................................ 21

## Statutes

28 U.S.C.
§1291 ........................................................................................ 4
§1331 ........................................................................................ 4

47 U.S.C.
§230(b)(2) ..................................................... 10, 47, 49, 61
§230(c)(1) ............................................ 10, 44, 46, 49, 50, 60
§230(e)(1) ............................................................................ 49
§230(e)(3) ............................................ 10, 44, 47, 49, 53, 60

Clark County Code
§7.100.080 ............................................................................ 55
§7.100.090 ............................................................................ 55

Code of the City of New Orleans
§26-614 .................................................................................. 10
§26-617(a)(2) ....................................................................... 12
§26-617(g) ..................................................................... 11, 42
§26-622(a)(1) .............................................. 15, 45, 51, 52, 54, 61
§26-622(a)(4) ..................................... 15, 17, 45, 50, 51, 54, 57

§26-624(k) ......................................................................... 17
§26-629 ............................................................... 12, 16, 50
§54-491.1(b) ...................................................................... 12

Comprehensive Zoning Ordinance of the City of New Orleans
§21.8.C.18(i) ..................................................................... 27
§21.8.C.18(*l*) ................................................................... 12
§21.8.C.18(m) .............................................................. 11, 27
§21.8.C.18(q) .................................................................... 12

La. Civ. Code Ann. Art. 2678 ...................................... 24, 28, 41

Ordinance No. 29381 M.C.S .............................................. 11

Ordinance No. 29382 M.C.S. .............................................. 11

Ordinance No. 30074 M.C.S. .............................................. 15

Santa Monica Mun. Code §§6.20.010-6.20.100 ...................... 57

**Rule**

Fed. R. App. P. 4(a)(1)(A) .................................................... 4

**Other Authorities**

63C Am. Jur. 2d Property §43 (May 2025) ............................. 28

Avisheh Avini, *The Origins of the Modern English Trust Revisited*,
70 Tulane L. Rev. 1139 (1996) .......................................... 5

2 William Blackstone, *Commentaries on the Laws of England*
(1766) ..................................................................... 6, 24

City of New Orleans Open Data, *Short-Term Rental Permit
Applications* (last accessed May 19, 2025) .......................... 13

*Inconsistent, Oxford English Dictionary* (2d ed. 1989) ............ 60

Jamila Jefferson-Jones, *Airbnb and the Housing Segment of the Modern Sharing Economy: Are Short-Term Rental Restrictions an Unconstitutional Taking?*, 42 Hastings Const. L.Q. 557 (2015) ...................................................... 6

Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730 (1998).................................................. 8, 9, 29, 30

Eugene J. Morris, *New Developments in Federal Takings Law*, 7 Pace Envtl. L. Rev. 310 (1990) ........................................................ 34

Sally Brown Richardson, *Reframing Ameliorative Waste*, 65 Am. J. Comp. L. 335 (2017) ........................................................ 5, 6

Nicholas Spear, *Taking Leases*, 80 U. Chi. L. Rev. 2005 (2013).......................................................... 24

*Treat, Oxford English Dictionary* (2d ed. 1989) ...................................... 60

## INTRODUCTION

Since even before the Founding, Americans have enjoyed the option of earning income by opening their homes to guests on a short-term basis. Such rentals make homeownership possible for some, and involve a fundamental aspect of property ownership for all, while providing consumers with low-cost and family-friendly lodging options that make travel more accessible. In recent years, online platforms like Airbnb have allowed this rich tradition to flourish by publishing listings that seamlessly connect property owners with guests.

Short-term rentals are not just an economic opportunity for hosts and cities; they are constitutionally protected. More than a century ago, the Supreme Court characterized the right to lease as an "essential attribute[] of property." *Terrace v. Thompson*, 263 U.S. 197, 215 (1923). And Louisiana's highest court has long recognized that "the right to lease" merits full constitutional protection. *State v. City Sav. Bank & Tr. Co.*, 127 So. 890, 891 (La. 1930).

New Orleans seeks to deny homeowners this fundamental property right. In recent years, it has enacted several ordinances that severely restrict short-term rentals in the City. Under a 2023 Ordinance, the City

allows only *one* short-term-rental permit per block assigned by lottery and prohibits any person from obtaining more than one permit. And under a 2024 Ordinance, the City has conscripted Airbnb into its law enforcement efforts. As the price for publishing truthful and useful information about short-term rentals, Airbnb and other platforms must continuously police hosts' listings to ensure compliance with the City's harsh requirements.

These measures are invalid, multiple times over. But two violations are particularly egregious and demand reversal of the decision below.

*First*, the 2023 Ordinance violates the Takings Clause. The right to lease one's property for a chosen duration is a constitutionally protected attribute of property deeply rooted in Louisiana law, longstanding historical practice, and Supreme Court precedent. The same is true for the corollary rights to include and exclude. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021). But the 2023 Ordinance appropriates these rights by dictating the acceptable duration of leases and preventing New Orleans homeowners from creating short-term leases, unless they literally win the lottery. Most homeowners can

2

include a wanted tenant for a weekend only if they forfeit their right to exclude that tenant for the balance of the month. Because the 2023 Ordinance appropriates these fundamental property rights without compensating owners, it effects *per se* and regulatory takings, in violation of the Fifth Amendment.

*Second*, the 2024 Ordinance violates Section 230 of the Communications Decency Act, which grants immunity to online platforms for third-party content posted online. Under Section 230, local governments may not require platforms to monitor, alter, or delete third-party content, like rental listings. But that is precisely what the 2024 Ordinance does. It expressly obligates Airbnb and other platforms to "verify" whether the content of third-party listings complies with the City's restrictions, and it prohibits platforms from processing or collecting fees for noncompliant listings. That requires monitoring, altering, or deleting third-party content. Indeed, this not only violates Section 230, but improperly forces private parties to act as *de facto* law enforcement agencies.

The district court rejected these challenges only by distorting well-settled law. It claimed that "no *per se* taking can occur in the absence of

3

physical acquisition (or ouster) by the government." But the Supreme Court has held that a "direct government appropriation" of a property right is a *per se* taking—even *without* a "physical invasion." *Lingle v. Chevron*, 544 U.S. 528, 537 (2005). If the district court were correct, numerous takings cases, including *Cedar Point*, would have come out the other way.

As for Section 230, the district court ignored this Court's precedents. And it empowered New Orleans to circumvent Section 230 by putting Airbnb to the false choice of entering the law enforcement business or forfeiting its federal protections for third-party content. That is not the law.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331. This Court has appellate jurisdiction over the district court's final judgment under 28 U.S.C. §1291. Plaintiffs timely filed their notice of appeal on September 16, 2025. Fed.R.App.P. 4(a)(1)(A).

## ISSUES PRESENTED

1. Whether New Orleans' prohibition on Host Plaintiffs leasing their homes for short terms appropriates their fundamental property rights without just compensation, in violation of the Takings Clause.

2. Whether New Orleans' regulation of short-term rental platforms holds Airbnb liable as a publisher of third-party content in violation of Section 230 of the Communications Decency Act, where the Ordinance requires online platforms to monitor, alter, and remove third-party listings.

## STATEMENT OF THE CASE

### A.    The Longstanding Tradition of Short-Term Rentals

The right to lease is a fundamental incident of property ownership with deep historical roots that long predate this Nation's Founding.  The lease traces its origin to the *locatio conductio* of Roman law and the "uses" of English common law.  *See* Sally Brown Richardson, *Reframing Ameliorative Waste*, 65 Am. J. Comp. L. 335, 348-50, 358-59 (2017); Avisheh Avini, *The Origins of the Modern English Trust Revisited*, 70 Tulane L. Rev. 1139, 1143-45 (1996).  These arrangements, like the modern lease that followed, allowed owners to reap the benefits of ownership by transferring their property for the use and enjoyment of

others.    *See* Richardson, *supra*, at 349; 2 William Blackstone, *Commentaries on the Laws of England* 141 (1766).

That tradition continued on this side of the Atlantic.  Americans in the early Republic recognized the underlying value of their properties and reaped substantial economic benefits by leasing their homes to guests on a short-term basis.  *See* Jamila Jefferson-Jones, *Airbnb and the Housing Segment of the Modern Sharing Economy: Are Short-Term Rental Restrictions an Unconstitutional Taking?*, 42 Hastings Const. L.Q. 557, 561-64 (2015); *see also, e.g., Faw v. Marsteller*, 6 U.S. (2 Cranch) 10 (1804).  Hence, cases from around the Founding frequently addressed the rights and responsibilities associated with leases.  *See, e.g., Pelletreau v. Jackson ex dem. Varick*, 11 Wend. 110 (N.Y. Sup. Ct. 1833); *Herbert v. Wren*, 11 U.S. (7 Cranch) 370 (1813); *Alexander v. Harris*, 8 U.S. (4 Cranch) 299 (1808).  The same occurred in the first half of the 19th century, when the leasehold grew in popularity as Americans began to exercise their fundamental right to lease their properties on a short-term basis, largely through week-to-week tenancies.  *See, e.g., Curley v. Dean*, 4 Conn. 259 (1822) (discussing weekly tenancy); *Jackson ex dem. Russell*

6

*v. Rowland*, 6 Wend. 666 (N.Y. Sup. Ct. 1831) (similar); *Reeves v. Dougherty*, 15 Tenn. (7 Yer.) 222 (1834) (similar).

Louisiana fully participated in this tradition. As cases from the early 20th century reflect, Louisianians have long exercised their right to lease their homes for various lengths of time, including via short-term arrangements. *See, e.g.*, *Sharp v. Zeller*, 38 So. 449, 451 (La. 1905) (describing properties "leasable [] by the week"); *Butler v. Jones*, 21 So. 2d 181, 182 (La. Ct. App. 1945) (defendant "rented … rooms by the week to various tenants."); *Muller v. Reynolds*, 26 So. 2d 498, 498 (La. Ct. App. 1946) (two rooms rented for "at a rate of $3 per day"); The Times Democrat (New Orleans, La.) (Nov. 3, 1912) (advertising apartments at weekly rate). These short-term rentals have brought significant benefits to property owners and guests alike: Property owners can realize the true value of their land, while their guests—who contribute to local economies—can experience unique communities, like New Orleans.

Given this tradition of Americans tapping into the value of their properties via the lease, Louisiana's highest court recognized nearly a century ago that "the right to lease … may be regarded as an incident of ownership" that receives full federal constitutional protections afforded

7

to other property rights. *City Sav. Bank*, 127 So. at 891. The robust protection afforded to the right to lease under Louisiana law mirrors the Supreme Court's own, earlier recognition that the right to lease is an "essential attribute[] of property," *Terrace*, 263 U.S. at 215, and one of those "fundamental rights which are the essence of civil freedom," *The Civil Rights Cases*, 109 U.S. 3, 22 (1883).

Since those pronouncements, the Supreme Court has protected property rights in other related ways. In *Cedar Point*, the Court held that "the right to exclude is 'universally held to be a fundamental element of the property right,' and is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" 594 U.S. at 150 (citations omitted). It emphasized that the right to exclude is "the '*sine qua non*' of property," such that appropriation of that fundamental element of property is a *per se* taking, including when the appropriation is accomplished via "regulation," "statute," "ordinance," or other means. *Id.* at 149-50, 152. This "right to exclude" is simply short-hand for "a gatekeeper power"—*i.e.*, "the right to determine who has access to particular resources and on what terms." Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 740 n.37 (1998). As a

8

result, it "encompass[es]" "the owner's right to *include* others." *Id.* at 742-43 (emphasis added). As summarized above, property owners have historically "included" others on their property by leasing it, often on a short-term basis. Indeed, the inseparable connection between the rights to include and exclude is well illustrated by government attempts to dictate minimum lease terms—a mandate that leases last at least 30 days simultaneously precludes a property owner's right to *include* guests for shorter periods and her right to *exclude* a tenant after any shorter period.

Leasing arrangements—of various durations—thus are doubly protected under the Constitution through two fundamental property rights: the right to lease and the right to include/exclude. *See Tyler v. Hennepin Cnty.*, 598 U.S. 631, 638 (2023) (Constitution draws on "traditional property law principles" and "historical practice" to protect private property owners' rights).

### B.    Congress's Protection for Online Platforms for Third-Party Content Posted Online

In the internet's early days, Congress grew concerned that online platforms would "severely restrict the number and type of messages posted" if they faced liability for third-parties' "millions of postings" on

9

their platforms. *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). It responded with Section 230 of the Communications Decency Act to preserve a "vibrant and competitive free market" on the internet that is "unfettered" by cumbersome regulations. 47 U.S.C. §230(b)(2). Section 230 preempts any "State or local law" that "treat[s]" an online platform as the "publisher" of third-party information. *Id.* §230(c)(1), (e)(3). Thus, local governments cannot regulate an online platform's "decisions relating to the monitoring, screening, and deletion of content." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 798 (5th Cir. 2024).

### C. The City's Severe Restrictions on Short-Term Rentals

#### 1. *The 2017 and 2019 Ordinances*

Despite the unbroken, centuries-old tradition of property owners' exercising their rights to lease and to include/exclude tenants, New Orleans chose a contrary path.

In 2019, after years of other restrictions, New Orleans severely curtailed short-term rentals, defined as "the use and enjoyment of a dwelling unit … by [paying] guests for a period of less than 30 consecutive days," Code of the City of New Orleans [hereinafter City Code] §26-614. One feature of this rights-denying crackdown was a prohibition on non-residents operating short-term rentals. This Court struck down that

10

primary-residence requirement as inconsistent with the Commerce Clause. *Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 326 (5th Cir. 2022) ("*Hignell-Stark I*").

### 2. The 2023 Ordinance

The City responded by again amending its regulations to restrict short-term rentals. *See* Ordinance No. 29381 M.C.S.; Ordinance No. 29382 M.C.S. (collectively, the "2023 Ordinance").

The 2023 Ordinance imposes two principal requirements. First, it limits short-term rental licenses to one property per square block in residential districts. *See* Comprehensive Zoning Ordinance of the City of New Orleans [hereinafter CZO] §21.8.C.18(m). Thus, if one property owner on the block exercises her right to offer short-term rentals, every other homeowner on the block is categorically banned. When multiple homeowners on the same block wish to offer short-term leases, they must enter a City-run lottery to determine the lucky winner of the sole license. *See* City Code §26-617(g). The City also completely bars property owners who live on a block with a preexisting short-term rental or bed-and-breakfast or those within the French Quarter from leasing their

11

properties on a short-term basis. *See* CZO §21.8.C.18(q); City Code §54-491.1(b).

Second, the 2023 Ordinance prohibits any person from obtaining more than one short-term rental permit, or owning, in whole or in part, more than one property rented out on a short-term basis. *See* City Code §26-617(a)(2). As a result, homeowners cannot separately lease multiple portions of their home (for example, a carriage house and an in-law apartment) or multiple properties on a short-term basis. *See* CZO §21.8.C.18(*l*).[1]

Property owners who violate these requirements face minimum penalties of $1,000 for each offense, and violations can result in the suspension or revocation of an owner's permit. *See* City Code §26-629.

The 2023 Ordinance severely burdens, and in many cases outright eliminates, residents' ability to operate short-term rentals. As a manifestation of this intended effect, the City has experienced a sharp

---

[1] Two other restrictions were recently invalidated by this Court: that (1) only natural persons offer short-term rentals (an equal protection violation) and (2) each short-term rental listing may advertise only one dwelling unit (a First Amendment violation). *See Hignell-Stark v. City of New Orleans*, 154 F.4th 345 (5th Cir. 2025) ("*Hignell-Stark II*"). *Hignell-Stark II* did not address the Takings Clause and Section 230 claims at issue here.

drop in short-term rental applications. In July 2023, it received over 2,000 lottery applications, resulting in approximately 900 permits. *See* City of New Orleans Open Data, *Short-Term Rental Permit Applications*, https://tinyurl.com/3k5dafcu (last accessed May 19, 2025). A year-and-a-half later, applications dropped to around 200, with only 125 resulting permits. *See id.*

The 2023 Ordinance has also caused substantial economic hardship for New Orleans property owners, including Host Plaintiffs. For example:

- Darian Morgan renovated and rented out the front of his home to help afford the rising cost of living in New Orleans. *See* ROA.573-74. After passage of the 2023 Ordinance, Mr. Morgan twice lost the lottery to another homeowner on his block. *See* ROA.574. Mr. Morgan cannot lease his home for less than a month as long as that homeowner maintains their license.

- Bret Bodin and Brad Newell have defrayed their costs of living by renting their upstairs loft and their carriage house on a short-term basis. *See* ROA.566-67. But the 2023 Ordinance's one-per-person and one-per-block caps prevent them from continuing to rent both

13

and so they have been forced to forego rental of their carriage house, despite investing substantial time and money to make it more attractive to guests, *see* ROA.570-71.

- Michael Rosas substantially renovated and successfully rented out both downstairs units of his triplex for short terms from 2019 until the 2023 Ordinance passed. ROA.576-77. It now prevents Mr. Rosas from renting out his second unit for less than a month, causing him to lose approximately $20,000 per year in rental income. *See* ROA.577.

- Mr. Rosas also owns Mid-City Mike Rentals, LLC, a limited liability company that owns a two-unit duplex in New Orleans, that was purchased and renovated for the purpose of serving as a short-term rental. *See* ROA.576-77. But Mid-City Mike is doubly barred from leasing its property on a short-term basis because it is a corporate entity and because a neighbor on the block has already been issued a short-term-rental permit. *See* ROA.577-78.[2]

---

[2] Mid-City Mike may benefit from this Court's determination in *Hignell-Stark II* that the City's effort to prohibit corporate owners from offering short-term rentals violates the Equal Protection Clause, if the provision is ultimately facially invalidated on remand. *See* 154 F.4th at 357-58. In all events, the Takings Clause independently prohibits the City from

14

### 3. *The 2024 Ordinance*

In 2024, the City enacted an ordinance that holds platforms like Airbnb liable for third-party content posted online. *See* Ordinance No. 30074 M.C.S. ("2024 Ordinance"). It does this through two main provisions, which require Airbnb to monitor, verify, alter, and remove third-party content on its platform or face substantial liability.

First, the 2024 Ordinance requires platforms to repeatedly "verify the legal eligibility" of each listing (1) "before any booking transaction is facilitated"; (2) "at least every 30 days" after that; and (3) "whenever [the platform] knows or should know that any data it used to complete the most recent verification has changed." City Code §26-622(a)(4) ("Verification Provision").

Second, the 2024 Ordinance prohibits platforms from "collect[ing] a fee or anything of value in exchange for conducting, facilitating, or completing any booking transaction for a short-term rental of a dwelling unit … not in compliance with this article." City Code §26-622(a)(1) ("Booking Transaction Provision").

---

restricting the property rights of corporate property owners without paying just compensation.

Like its restrictions on hosts, the City's restrictions on platforms are backed by significant penalties, including minimum fines of $1,000 per day. *See* City Code §26-629.

### D.    This Litigation

Plaintiffs filed the operative, amended complaint in April 2025, seeking declaratory, injunctive, and compensatory relief. ROA.226. The City moved to dismiss, while Plaintiffs cross-moved for summary judgment.

The district court rejected Plaintiffs' *per se* takings claim because the City had not taken "physical possession" of their property. ROA.893. As to Plaintiffs' argument that the City had nullified fundamental elements of their property right—the rights to lease and to include—the court stated that "questions surrounding fundamental rights are an irrelevant distraction," theorizing that only "physical acquisition (or ouster)" can support a *per se* takings claim. ROA.894. It rejected Plaintiffs' regulatory takings claim on similar grounds that would collapse the two alternative doctrines by essentially requiring a physical taking to mount a successful regulatory taking. ROA.899-900.

16

The district court rejected Airbnb's Section 230 claim on the ground that the "2024 Ordinance does not require Airbnb to monitor or delete anything from its website." ROA.926. But it failed to consider the Verification Provision's express obligation that platforms "verify" third-party listings, City Code §26-622(a)(4). It also bypassed this Court's Section 230 precedents, which require a "functional" approach that examines the practical consequences of a legal obligation and not simply how it is "styled." *See infra* section II.C. The district court emphasized that Airbnb could avoid the restriction on its rights by converting into an unpaid voluntary service—*i.e.*, it remained "free … to allow as many unlawful [short-term rental] listings on its website as it chooses to" if it would forgo accepting the payments that make its "business model" viable. ROA.927.

Plaintiffs also challenged the Ordinances on multiple additional grounds, including the Due Process Clause and the First and Fourth Amendments. ROA.296-98; *see* City Code §26-624(k). The district court awarded partial relief to Plaintiffs on their Fourth Amendment claim— holding unlawful the City's monthly reporting requirement—but dismissed the remaining claims.

17

## SUMMARY OF THE ARGUMENT

**I.**    The 2023 Ordinance effects both *per se* and regulatory takings, in violation of the Takings Clause.

**A.**    The 2023 Ordinance is a quintessential *per se* taking because it appropriates Host Plaintiffs' fundamental rights to lease and include/exclude.  The right to lease is a constitutionally protected attribute of property deeply rooted in Louisiana law, longstanding historical practice, and Supreme Court precedent.  And the corollary rights to include and exclude likewise are entitled to full constitutional protection.  New Orleans has categorically deprived many property owners, including Host Plaintiffs, of these fundamental property rights without compensation.  New Orleans could not constitutionally bar its residents from renting out their properties or inviting guests into their homes.  But neither the duration of the rental nor the financial basis for the invitation fundamentally changes the analysis.  Indeed, by mandating that if homeowners include guests for a weekend they lose their right to exclude them for the balance of the month, New Orleans plainly effects a *per se* taking.

18

**B.**    The 2023 Ordinance also effects a regulatory taking.  As the district court acknowledged, it causes significant economic harm by depriving Host Plaintiffs of rental income, and frustrates their historically grounded, investment-backed expectations.    The district court nonetheless rejected Host Plaintiffs' regulatory-taking arguments principally because the intrusion on their property rights was not severe enough to effect a physical taking.  That analysis would collapse the separate restrictions on *per se* and regulatory takings, and render the latter the null set.  That analysis cannot stand.

**II.**    The 2024 Ordinance violates Section 230 by requiring Airbnb and other platforms to verify, monitor, alter, and delete third-party content.

**A.**    In order to preserve a vibrant and competitive internet, Section 230 preempts state or local laws that impose duties on platforms to verify, monitor, alter, or remove third-party content.  Courts applying Section 230 must perform a "functional" analysis of what the legal duty "actually requires" in practice, and not how a particular ordinance might be styled.  *Salesforce*, 123 F.4th at 793.

19

**B.** The 2024 Ordinance violates Section 230 in at least two ways. The Ordinance requires Airbnb and other platforms to verify, monitor, alter, and delete short-term rental listings posted by third parties (*i.e.*, hosts), even in the absence of any booking activity. The Ordinance also prohibits platforms from processing or collecting fees for noncompliant listings. Section 230 squarely preempts these provisions because Airbnb cannot comply with these requirements—individually or the combination—without verifying, monitoring, altering, and removing user-generated content.

**C.** The district court came to the opposite conclusion by relying on *HomeAway.com v. Santa Monica*, 918 F.3d 676 (9th Cir. 2019). That choice was fundamentally flawed, for two reasons. First, *HomeAway* reviewed a local ordinance that—unlike New Orleans'—imposed no express verification requirement and did "not require … [p]latforms to monitor third-party content." *Id.* at 682. Even a facial comparison of the two ordinances makes clear that *HomeAway* cannot govern here. Second, and more fundamentally, by rooting its analysis in *HomeAway*'s mechanical framework, the district court ignored *this* Court's "functional" Section 230 analytical framework compelling examination of

20

what the law "actually requires." *Salesforce*, 123 F.4th at 795. Under this correct analysis, Section 230 bars enforcement of the Ordinance.

***

The problems with New Orleans' Ordinances do not end there. They infringe on Plaintiffs' due process rights and impose vague standards allowing arbitrary enforcement. They compel Airbnb to act as a law enforcement agent and disclose host information in violation of the Fourth and First Amendments. But above all, they ignore the protections of the Taking Clause and Section 230.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's ruling on motions to dismiss and for summary judgment, applying the same standards as the district court. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 878 (5th Cir. 2022).

## ARGUMENT

## I.    NEW ORLEANS' 2023 ORDINANCE VIOLATES THE TAKINGS CLAUSE.

The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "By requiring the government to pay for what it takes, the Takings Clause saves individual property owners from bearing 'public burdens

21

which, in all fairness and justice, should be borne by the public as a whole.'" *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 273-74 (2024) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). Government action that triggers the Takings Clause is divided into "*per se* takings" and "regulatory takings." *See Cedar Point*, 594 U.S. at 146-49. The 2023 Ordinance—whose various restrictions bar categories of property owners, like Host Plaintiffs, from exercising their fundamental property rights to offer short-term rentals on their properties—constitutes a taking under either framework.

### A.   The 2023 Ordinance Effects *Per Se* Takings.

*Per se* takings occur whenever government interference with property effects "a direct government appropriation *or* physical invasion of private property." *Lingle*, 544 U.S. at 537 (emphasis added). The disjunctive "or" is significant. *Per se* takings are not limited to scenarios where the government actually invades property. Rather, the government effects a *per se* taking whenever it appropriates "a fundamental element of the property right," *Cedar Point*, 594 U.S. at 150 (citation omitted), or "otherwise interfere[s]" with that right, *see Sheetz*, 601 U.S. at 274. Once a *per se* taking occurs, there is no balancing of

22

interests that might excuse the taking; the government instead has a categorical obligation to pay just compensation—full stop. *See id.*

When conducting the takings analysis, courts must consult not only existing rules and understandings about property rights, including state law, but also "traditional property law principles," "historical practice," and "[Supreme Court] precedents" to assess whether an asserted property interest is protected against government appropriation. *Tyler*, 598 U.S. at 638. The right to lease and the right to include/exclude are two fundamental property rights that inhere in property ownership and thus enjoy the Takings Clause's protection. *See supra* pp.5-9. Because the 2023 Ordinance appropriates those fundamental property rights, it effects *per se* takings.

1.    Start with the right to lease. Louisiana law has long recognized that the right to lease constitutes a right incident to a property owner's title to the property. "Full ownership of property" under Louisiana law has three primary components: the "(1) *usus*—the right to use or possess, i.e., hold, occupy, and utilize the property; (2) *abusus*— the right to abuse or alienate, i.e., transfer, *lease*, and encumber the property, and (3) *fructus*—the right to the fruits, i.e., to receive and enjoy

23

the earnings, profits, rents, and revenues … derived from the property." *Rodrigue v. Rodrigue*, 218 F.3d 432, 436-37 (5th Cir. 2000) (emphasis added). That is why, for nearly a century, the Louisiana Supreme Court has deemed "the right to lease … an incident of ownership" that receives full federal constitutional protections. *City Sav. Bank*, 127 So. at 891. And those protections safeguard an owner's ability to create leasehold interests of *any* duration, as a lease's term is its defining characteristic. *See* Nicholas Spear, *Taking Leases*, 80 U. Chi. L. Rev. 2005, 2016 (2013); Blackstone, *supra*, at 103-04, 140; La. Civ. Code Ann. Art. 2678 (all leases "shall be for a term," whose "duration" is defined "by the parties"). There is nothing magical (or constitutionally significant) about monthly rentals. Indeed, throughout our Nation's history, rentals for shorter periods were commonplace.

Longstanding Louisiana property-law principles reflect wider historical practice. As noted, for many centuries, property owners have leased their properties to others to unlock the full value of their homes. *See supra* pp.5-9. And the Supreme Court has long recognized that "the Constitution protects" "the right to … lease," as an "essential attribute[]" of property," *Terrace*, 263 U.S. at 215, and one of the "fundamental rights

24

which are the essence of civil freedom," *The Civil Rights Cases*, 109 U.S. at 22. Indeed, property owners exercised the right both before and after the Founding and at the time of the adoption of the Fourteenth Amendment. *E.g.*, *Alexander*, 8 U.S. (4 Cranch) 299; *Faw*, 6 U.S. (2 Cranch) 10; *Tondro v. Cushman*, 5 Wis. 279 (1856). And they frequently did so by creating leasehold interests of short-term durations. *See supra* pp.5-9; *see also Tondro*, 5 Wis. 279 (describing weekly tenancy); *Sherlock v. Thayer*, 4 Mich. 355 (1856) (same); *Horton v. Handvil*, 3 A. 72 (N.J. Ch. 1886); *Barrere v. Shuber*, 5 La. App. 67, 68 (1926) (owner sought damages for her inability to "rent[] two rooms at five dollars per week"); *Thompson v. Moran*, 19 La. App. 343, 344 (1932) (weekly rental of a room).

That Louisiana law and federal courts have consistently and uniformly understood that the right to lease inheres in property ownership leaves no doubt that it qualifies as a fundamental property right. *See Tyler*, 598 U.S. at 638. Accordingly, governmental appropriation of the right to lease is a *per se* taking. *See Cedar Point*, 594 U.S. at 149. Consistent with that understanding, the Supreme Court has awarded just compensation to property owners when the government appropriates leasehold interests—regardless whether it takes the entire

leasehold interest, *see, e.g., United States v. Petty Motor Co.*, 327 U.S. 372 (1946), or only part, *see, e.g., United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945). *See also Kohl v. United States*, 91 U.S. 367, 377-78 (1875) (all owners of interests in the seized parcel could seek recovery for the appropriation of their property interests); *cf. Garrison v. City of New York*, 88 U.S. (21 Wall.) 196, 203-05 (1874). Although these cases involved existing leases, the logic remains the same when the government bars the creation of certain leasehold interests *ab initio*. The government could not swoop in tomorrow and categorically deny homeowners the right to lease their properties for any length of time. Doing so would extinguish one of the fundamental incidents of property ownership and limit property ownership to the lucky few who can afford homes without any need for rental income. Precluding rentals for anything less than a government-specified period of time, be it a year or a month, is not materially different (and interferes with the homeowners' right to exclude to boot). Simply put, the Takings Clause protects the right to lease against government appropriation.

New Orleans' 2023 Ordinance—which severely restricts and in many cases altogether prohibits short-term rentals—effects such a

26

taking. Due to the one-short-term-rental-per-block restriction, Morgan is categorically barred from exercising his fundamental right to create leasehold interests with terms of less than 30 days. *See* ROA.574. New Orleans thus has denied him and others who have the misfortune of owning property on the same block as someone currently offering short-term leases or running a bed-and-breakfast the ability to create short-term leases. *See* CZO §21.8.C.18(m). That is the quintessential form of government appropriation of the right to lease—"a fundamental element of the property right"—and thus a *per se* taking. *Cedar Point*, 594 U.S. at 150 (citation omitted).

The same holds for New Orleans' bar on property owners offering more than one short-term rental opportunity. *See* CZO §21.8.C.18(i). Bodin, Newell, and Rosas wish to lease portions of their properties on a short-term basis but cannot do so because they currently offer other short-term leases on their properties, and multiple short-term leases are verboten. *See* ROA.567; ROA.570; ROA.577. Mid-City Mike is also barred from offering short-term rentals on its property because of the one-short-term-rental-per-block restriction. *See* ROA.577-78.

27

By preventing these owners from creating leases with their preferred short-term durations, New Orleans has appropriated a fundamental "stick[] in the bundle of rights that inhered in ownership." *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012). Once the government denies an owner the ability to define the duration of a term or offer multiple leasehold interests, it has deprived the owner of his right to lease. A lease's duration is its defining characteristic, *see supra* p.24; La. Civ. Code Ann. Art. 2678, and property ownership encompasses "the right to carve out … *as many* estates or interests, perpendicular or horizontal, perpetual *or limited*, as [the property] may … sustain," 63C Am. Jur. 2d Property §43 (May 2025) (emphases added). By stepping into the shoes of property owners and dictating the permissible lease term and the number of leases they may create, New Orleans has commandeered Plaintiffs' right to lease and effected a *per se* taking of that fundamental right, requiring just compensation. *See, e.g., Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1294 (Fed. Cir. 2008) (government's commandeering the water's flow effected a *per se* taking of water rights); *Va. Hosp. & Healthcare Ass'n v. Roberts*, 671 F.Supp.3d 633, 651 (E.D. Va. 2023)

28

("[G]overnment cannot commandeer a professional's service and time for public use without providing just compensation.").

2.     The 2023 Ordinance likewise effects a *per se* taking of the right to include/exclude.  As the Supreme Court has explained, a property owner's "right to exclude" is "'one of the most treasured' rights of property ownership" and "one of the most essential sticks in the bundle of rights that are commonly characterized as property"—"the '*sine qua non*' of property."  *Cedar Point*, 594 U.S. at 149-50 (quoting Merrill, *supra*, at 730).    Thus, the government effects a *per se* taking whenever it appropriates that right.  *See id.* at 149.  By dictating the minimum period of a permissible lease, New Orleans interferes directly with the right to exclude and include.  To the extent that Plaintiffs would like to include tenants for five days and then exclude them thereafter, the Ordinance robs Host Plaintiffs of both the right to include and exclude.  Both are fully protected by the Takings Clause.  The rights are simply two sides of the same coin.[3]  To say that property owners have a right to "exclude"

---

[3] The law broadly protects corollary rights.  *E.g.*, *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) ("the right not to associate" merits First Amendment protection); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988) ("freedom of speech" "compris[es] the decision of … what *not* to say"); *Rock v. Arkansas*, 483 U.S. 44, 52-53 (1987) (Fifth

29

others from their property is just another way of saying they have a right to decide whom to "include" by granting access. *See Union Carbide Corp. v. Alexander*, 679 S.W.2d 938, 940 (Tenn. 1984) (property ownership carries several fundamental rights and the corollary "right to refuse to do any of the[m]"). Indeed, the right to exclude is critical in large part because it facilitates an owner's ability to tap into the value of the property by selectively deciding which third parties to *include* on the property and on what terms—often via a lease.

For that reason, property-law scholars have long recognized that the right to include and the right to exclude are joined at the hip. *See* Merrill, *supra*, at 742-43 ("[T]he right to exclude must encompass … the owner's right to include others."). So, too, has the Supreme Court. *See, e.g.*, *Dolan v. City of Tigard*, 512 U.S. 374, 394 (1994) (forcing an owner to give up a public easement causes her to "lose all [her] rights to regulate the time in which the public entered"—*i.e.*, her right to include—while also "eviscerat[ing]" "[h]er right to exclude"). It follows that both merit

---

Amendment protects right to testify, a "corollary" of the "guarantee against compelled testimony."); *Faretta v. California*, 422 U.S. 806, 807 (1975) (the Sixth Amendment's right to counsel includes a defendant's right to "conduct his own defense" without counsel).

the same constitutional protections and both are violated by a law that dictates that a property owner can include tenants for a weekend only by sacrificing the right to exclude them for the rest of the month. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 365-66 (2015).

By forbidding entire categories of property owners from welcoming paying guests of their choosing who wish to stay on the properties only for short periods, the 2023 Ordinance directly "interfere[s] with the owner's right" to include others on the property, thus effecting *per se* takings of that right, *Sheetz*, 601 U.S. at 274—regardless whether the appropriation arises from "a regulation (or statute, or ordinance, or miscellaneous decree)," *Cedar Point*, 594 U.S. at 149-50. Plaintiffs' experiences illustrate the point. They wish to include paying, short-term guests on their properties, but cannot do so. Morgan cannot seek out such individuals because one of his neighbors is already doing so. *See* ROA.574. Although Bodin, Newell, and Rosas can invite paying, short-term guests on part of their property, they have reached their City-defined limit—now no other short-term guests are legally welcome. *See* ROA.567; ROA.570; ROA.577. And because it owns property on a block with a pre-existing short-term rental, Mid-City Mike has no power to

31

invite guests who wish to remain on the properties for only short intervals. *See* ROA.577-78.

In each instance the City has forbidden Plaintiffs from including the particular guests they want to invite on the property without giving up their right to exclude such guests thereafter—putting them to the choice of forgoing leasing altogether or welcoming those who wish to stay for longer than a month (to whom Plaintiffs would not otherwise lease). *See Cienega Gardens v. United States*, 331 F.3d 1319, 1338 (Fed. Cir. 2003) (Takings Clause violated by compelling homeowners to rent only to individuals participating in low-rent housing programs to whom they would not otherwise lease, encroaching on their right to exclude). That is precisely the kind of "intrusion on property rights [that] is a *per se* taking" and requires an award of just compensation. *Sheetz*, 601 U.S. at 274.

3.    The district court's contrary conclusions are deeply flawed. It rejected Plaintiffs' *per se* taking claims based on a single mistaken premise: that "[p]hysical possession" by the government "is the crucial element" of a *per se* taking claim. The district court posited that "there is no support in the Supreme Court's takings jurisprudence … to suggest

32

that a per se taking can occur in the absence of physical acquisition (or ouster) by the government." ROA.893-94; *see* ROA.893 (dismissing *per se* takings claims because the restrictions do not "involve the City acquiring physical possession" of Host Plaintiffs' property).

That absolutist statement is absolutely wrong. The Supreme Court has long held that *per se* takings occur with "direct government appropriation *or* physical invasion." *Lingle*, 544 U.S. at 537 (emphasis added); *accord Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977) ("[I]t is sufficient if the action by the government involves a direct interference with or disturbance of property rights" (citing *Pumpelly v. Green Bay Co.*, 80 U.S. (13 Wall.) 166 (1871)).

The Supreme Court's nearly-40-year-old decision in *Hodel v. Irving*, 481 U.S. 704 (1987), is illustrative. There, a unanimous court held that a mandatory escheatment law—which destroyed property owners' ability to devise property to their chosen heirs—violated the Takings Clause without physical interference with any property. *See id.* at 716. All that mattered is that "the right to pass on valuable property to one's heirs is itself a valuable right"—one that "has been part of the Anglo-American

33

legal system since feudal times"—given "a *total* abrogation of th[at] right[] cannot be upheld." *Id.* at 715-17; *see* Eugene J. Morris, *New Developments in Federal Takings Law*, 7 Pace Envtl. L. Rev. 309, 310 (1990) (in *Hodel,* a "unanimous Court held that the escheat of a fragment of the total fee title to the property was a *per se* taking"); *Cienega,* 331 F.3d at 1338 (*Hodel* based its holding solely on the nature of the government action). The *Hodel* Court thus had little difficulty finding a *per se* taking "even in the absence of physical acquisition (or ouster) by the government." ROA.894; *see U.S. Tr. Co. of N.Y. v. New Jersey,* 431 U.S. 1, 19 n.16 (1977).

The Supreme Court's more recent cases reinforce the point. In *Cedar Point,* the Court explained that *per se* takings occur when there is an appropriation of "*a fundamental element of the property right*"—no matter whether that appropriation is effected by or "comes garbed as a regulation," "statute," or "ordinance," 594 U.S. at 149-50, 158 (citation omitted; emphasis added). As the indefinite article "a" indicates, *Cedar Point* presupposed that "the property right" contains more than one "fundamental element" and entails more than preventing government-facilitated physical intrusion of unwanted third parties on property. *See*

34

*McFadden v. United States*, 576 U.S. 186, 191 (2015) (As an indefinite article, "a" means "[s]ome undetermined or unspecified particular."). And just a few Terms later, the Court reaffirmed that *per se* takings occur whenever government "physically appropriate[s] property *or otherwise interfere*[*s*]" with fundamental elements of one's property rights. *Sheetz*, 601 U.S. at 274 (emphasis added).

The district court's understanding of *per se* takings is not merely wrong; it is a recipe for government overreach. If *per se* takings truly required a physical invasion, governments could categorically prohibit property owners from *ever* leasing their homes to *anyone* for *any* length of time without committing a *per se* taking. They could even issue a diktat that property owners must exclude *all* third parties—family, friends, and others—from their properties *forever*, as the government technically would not have physically invaded the property in those situations. That physical-invasion-only theory of *per se* takings "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013).[4]

---

[4] Even accepting the erroneous premise that physical interference is a prerequisite for *per se* takings claims, it bears emphasizing that the 2023 Ordinances do have a physical dimension: New Orleans has declared that short-term rental guests may not *physically* reside in Plaintiffs' homes.

A Takings Clause that protects only the hermit or those wealthy enough to have no need to unlock their property's value via leasing is an empty vessel. The far better view—and the one supported by controlling precedent, history, and common sense—is that the Clause protects the fundamental rights to lease and to include, no matter how long the owner lets his guests remain on the property.

Nor is there any force to the district court's unsupported assertion that "no fundamental rights are implicated" here. ROA.894. The court reached that conclusion only by importing a substantive *due-process* test and then misapplying that test.[5] *See* ROA.903-05. Whatever is true for purposes of mounting a substantive-due-process claim, there is no

---

[5] The district court misapplied that analysis by reviewing only cases from "residential neighborhoods of New Orleans" that "dat[ed] back to the 19th Century." ROA.903. Plaintiffs here have cited a host of cases from around this Nation's founding and from jurisdictions across the country that amply demonstrate a robust national tradition of leasing on daily and weekly bases. *See supra* pp.6-8. In fact, a full account of this Nation's history and tradition underscores that leasing, even on a short-term basis, is "deeply rooted in the Nation's history and tradition." *See supra* pp.5-9. But whatever is true for purposes of the demanding standard for substantive-due-process claims, there is little doubt that the rights to lease and include/exclude are fundamental property rights protected by the Takings Clause and the procedural protections of the Due Process Clause and the Equal Protection Clause. It is beyond obvious that the government cannot eliminate the right to offer short-term rentals in a wholly arbitrary manner or limit the right to members of one race.

disputing that the rights to lease and include/exclude are *fundamental property rights* protected by the *Takings Clause. E.g., The Civil Rights Cases*, 109 U.S. at 22 (the "right to … lease" is a "fundamental right[]"); *Hignell-Stark II*, 154 F.4th at 353 (the right to lease is "an essential incident of home ownership"); *Cedar Point*, 594 U.S. at 150 ("[T]he right to exclude is 'universally held to be a fundamental element of the property right.'" (citation omitted)); *cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 999 (1984) (referring to the exclusion right as the "fundamental right to exclude").

Accordingly, this Court's recent *due-process* discussion in *Hignell-Stark II* has no bearing on the takings analysis here. There, the Court had no occasion to address any takings claim, and its analysis as to whether the plaintiffs there had identified a Due-Process-Clause-protected property interest considered only the effort of the plaintiffs there to identify a property right in (relatively recent) state law, including cases (from this century) treating short-term rentals as "commercial" in nature. 154 F.4th at 353-54. That inquiry does not govern the Takings Clause analysis (and should not limit subsequent plaintiffs' efforts to identify a more robust historical tradition based on

37

precedents correctly recognizing leasing of a home as a quintessential residential use).[6]  As the Supreme Court has emphasized, state law "cannot be the only source" for identifying property interests for takings purposes.  *Tyler*, 598 U.S. at 638.  Courts considering takings challenges must "also look to 'traditional property law principles,' plus historical practice and [Supreme Court] precedents."  *Id.*  "Otherwise," governments "could 'sidestep the Takings Clause by disavowing traditional property interests' … [they] wish[] to appropriate."  *Id.*

The full complement of relevant factors—traditional property principles, historical practice, and Supreme Court cases—reveal that

---

[6] The vast majority of jurisdictions to address the question agree that short-term rentals are a form of *residential* use.  *E.g.*, *Lake Serene Property Owners Ass'n v. Esplin*, 334 So.3d 1139, 1143 (Miss. 2022). Indeed, nineteen jurisdictions have held that short-term rentals are "residential" in nature or have acknowledged that "the term 'residential' can also refer to stays of a shorter duration."  *Pandharipande v. FSD Corp.*, 679 S.W.3d 610, 627 (Tenn. 2023) (collecting cases); *Forshee v. Neuschwander*, 914 N.W.2d 643, 648 (Wis. 2018); *Pinehaven Plan. Bd. v. Brooks*, 70 P.3d 664, 668 (Idaho 2003); *cf. Elk Point Country Club Homeowners' Ass'n v. K.J. Brown, LLC*, 515 P.3d 837, 840 (Nev. 2022). After all, "property is used for 'residential purposes' when those occupying it do so for ordinary living purposes," such as "to relax, eat, sleep, bathe, and engage in other incidental activities," and the "receipt of rental income in no way detracts from the use of the properties as residences."  *Slaby v. Mountain River Ests. Residential Ass'n*, 100 So.3d 569, 579-80 (Ala. Ct. Civ. App. 2012).

property owners hold the fundamental rights to lease their property and to include others on their property for durations of their choosing, including on a short-term basis. The district court erred in holding otherwise. The City cannot forbid Plaintiffs from exercising those fundamental rights without paying them just compensation.[7]

### B. New Orleans' 2023 Ordinance Also Effects Regulatory Takings.

The 2023 Ordinance also effects regulatory takings under *Penn Central*. *Penn Central* involves an ad hoc consideration of the law's economic impact, its interference with investment-backed expectations, and character of the government action. *See Cedar Point*, 594 U.S. at 148. Those factors confirm that the Ordinance here is at least the "functional[] equivalent" of a *per se* taking. *Lingle*, 544 U.S. at 538-39.

The 2023 Ordinance's economic burdens are palpable. Bodin and Newell had earned nearly $50,000 over a two-year period by offering

---

[7] New Orleans also violated the Takings Clause by forcing Airbnb to list *New Orleans* as an insured on the commercial liability insurance policy (that must be issued by a Louisianan insurer) that the City requires the platform maintain. *See* ROA.308-09. While the average insured normally pays money to attain such an interest in the proceeds of an insurance policy, the City has seized that status by legislative fiat without compensating Airbnb. *But see Lynch v. United States*, 292 U.S. 571, 579 (1934); *Lingle*, 544 U.S. at 537.

short-term rentals at their carriage house. *See* ROA.567; *accord* ROA.265. But the 2023 Ordinance cuts off that entire income stream by prohibiting owners from using their properties for multiple short-term rentals. The same restriction has also denied Rosas nearly $20,000 in rental income. *See* ROA.577; *accord* ROA.270. The one-per-city-block restriction has also caused Morgan to lose thousands of dollars. *See* ROA.573-74; *accord* ROA.267. And the ban on corporate property owners offering short-term-rentals and the one-per-block restriction have prevented Mid-City Mike from earning any short-term rental income or recouping the nearly $30,000 spent on renovations. *See* ROA.577-78; *accord* ROA.269-70. These concrete economic losses plainly satisfy *Penn Central*'s economic-impact prong. *See, e.g., Heights Apartments, LLC v. Walz*, 30 F.4th 720, 734 (8th Cir. 2022) (allegations about lost rental income suffice to satisfy the economic-impact prong). Indeed, even the district court had "little doubt" that Plaintiffs satisfied this prong. ROA.897.

The 2023 Ordinance likewise interferes with Plaintiffs' investment-backed expectations—another prong the district court found readily satisfied. *See* ROA.897. Louisiana law has long protected property

40

owners' right to lease, which encompasses their right to set its term, no matter how long. *See* La. Civ. Code Ann. Art. 2678; *City Sav. Bank*, 127 So. at 891. And that is on top of the unbroken, centuries-old tradition— predating the Founding—of individuals exercising their fundamental property rights to invite others on their properties, even on a short-term basis. *See supra* pp.5-9, 24-25. In line with that practice, Plaintiffs made significant investments with an eye toward hosting short-term guests. Bodin and Newell spent nearly $77,000 renovating their carriage house for short-term renters. *See* ROA.566. Morgan invested in furnishings that would suit the unique needs of short-term renters. *See* ROA.574. Rosas made short-term-rental-focused improvements on his property that cost nearly $40,000. *See* ROA.576-77. And Mid-City Mike spent $30,000 to do the same on its property. *See* ROA.577. However, none can recoup those costs, as the City has prohibited Plaintiffs from realizing their end goal of offering short-term rentals. Plaintiffs had no reason to believe that New Orleans would buck the traditional, historically grounded practice to destroy their fundamental rights. *See, e.g.*, *Ruckelshaus*, 467 U.S. at 1011-12 (regulation denying protections to trade secrets considered lawful prior to its adoption interfered with

41

reasonable investment-backed expectations); *accord Murr v. Wisconsin*, 582 U.S. 383, 396 (2017).

That leaves the character-of-government-action prong, which weighs strongly in favor of a taking here. As noted above, there are powerful arguments that the Ordinance here effects a *per se* taking. But even if it falls just short, it plainly interferes with a valuable use of property that has been employed for centuries and continues to be employed in most of the Nation. The notion that such a right can be disregarded without triggering any analysis under the regulatory takings doctrine is wholly misguided. And if using a lottery system to determine who may exercise their fundamental property rights, *see* City Code §26-617(g), does not qualify as sufficiently "extraordinary" to constitute a taking, it is hard to imagine what would, *Hodel*, 481 U.S. at 716.

The district court refused to accept that conclusion principally by employing the same misguided approach it used to reject Plaintiffs' *per se* arguments. *See* ROA.899-900 (ignoring that the right to lease encompasses the right to set the lease's term). That flawed reasoning remains just as flawed the second time around. But the court did not stop there. It also suggested that Plaintiffs' focus on particular sticks in

42

the property-rights bundle is "contrary to established Supreme Court precedent." ROA.899. But Plaintiffs simply followed the Supreme Court's lead in *Hodel*. There, the Court found a taking even though the government took only "the right to pass on property," another stick in the bundle. 481 U.S. at 716. And while the court believed that the Ordinance is "reasonably related to the promotion of the general welfare," ROA.898-99, those policy goals cannot help New Orleans avoid liability: They do not make it "appropriate [for the City] to take the extraordinary step" of abrogating fundamental property rights without paying just compensation. *Hodel*, 481 U.S. at 718; *see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1031 (1992) ("legislat[ive] declaration" that a property use is "inconsistent with the public interest" cannot avoid a Takings Clause violation).

At bottom, the Takings Clause "bar[s] Government from forcing some … to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49. The district court did not dispute that New Orleans developed the 2023 Ordinance to "benefit the hotel industry," ROA.905 n.11, and acknowledged that Plaintiffs bear its "burdens … more than" other (more

43

fortunate) property owners who can exercise their fundamental rights. ROA.899. It thus should come as no surprise that all three *Penn Central* factors—two of which the district court had "little doubt" were met, ROA.897—confirm that the 2023 Ordinance effects a regulatory taking.[8]

## II. THE 2024 ORDINANCE VIOLATES SECTION 230.

The district court erred in dismissing Plaintiffs' Section 230 claim. Section 230 immunizes online platforms from liability for third-party content posted online. It does so by preempting "any State or local law that is inconsistent" with this principle. 47 U.S.C. §230(c)(1), (e)(3). This Court has properly given effect to the text of Section 230 and its protections through a "functional" analysis that looks not just at how a legal obligation is "styled" but what the law "actually requires" in practice. *Salesforce*, 123 F.4th at 793. Accordingly, Section 230 bars any law that imposes duties on platforms "relating to the monitoring, screening, and deletion of content" because they are "actions

---

[8] In all events, if the Ordinance's severe restrictions on fundamental property rights somehow survived under *Penn Central*, that would underscore that the time has come for the Supreme Court to revisit the test, which is unmoored from the Takings Clause itself. *Murr*, 582 U.S. at 419 (Thomas, J., dissenting); *accord* ROA.286-87; ROA.534.

44

quintessentially related to a publisher's role." *Salesforce*, 123 F.4th at 798.

The 2024 Ordinance does exactly what Section 230 forbids in at least two ways. The Ordinance requires Airbnb and similar platforms to "verify the legal eligibility" of third-party short-term rental "listings" (the Verification Provision). City Code §26-622(a)(4). And it also prohibits platforms from "collecting a fee or anything of value in exchange for conducting, facilitating, or completing any booking transaction" that is based on a noncompliant listing (the Booking Transaction Provision). *Id.* §26-622(a)(1). Airbnb cannot comply with either requirement without making "decisions relating to the monitoring, screening, and deletion of content." *Salesforce*, 123 F.4th at 798. Indeed, it would be beyond obvious that a parallel requirement to require companies to verify the veracity or lawfulness of third-party speech before posting it would directly run afoul of Section 230. Demanding that Airbnb monitor third-party listings for compliance with New Orleans' licensing scheme is no different.

The district court's contrary conclusion relied on an outlier Ninth Circuit decision that is both inapposite and incorrect. *See HomeAway*,

45

918 F.3d at 680, 682-84. *HomeAway* addressed a Santa Monica ordinance that on its face did "not require the [p]latforms to review the content provided by the hosts of listings on their websites" and therefore did "not require … [p]latforms to monitor third-party content," *id.* at 682, as the 2024 Ordinance does. More fundamentally, *HomeAway* cannot be reconciled with Section 230's text, or with *this* Court's "functional" approach to Section 230 immunity, *Salesforce*, 123 F.4th at 793, or even with subsequent decisions of the Ninth Circuit itself. *See infra* section II.C. This Court should follow its own precedents and hold that the Ordinance violates Section 230.

> **A.  Section 230 Preempts Laws Requiring Online Platforms to Monitor, Alter, or Delete Third-Party Online Content.**

Congress enacted Section 230 to immunize internet platforms from liability for third-party content posted online: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §230(c)(1). Section 230 operates by preempting state or local laws that conflict with this Congressional purpose: "[n]o cause of action may be brought and no liability may be imposed under any State or local

46

law that is inconsistent with this section." *Id.* §230(e)(3). Section 230 thus forbids laws imposing duties "relating to the monitoring, screening, and deletion of content," *Salesforce*, 123 F.4th at 798 (quoting *Myspace*, 528 F.3d at 420), including "reviewing or analyzing third-party content," "editing or altering third-party content," and "deciding how third-party content [i]s organized or displayed," among other publishing-related decisions, *id.* at 799.

Section 230's express purpose is "to preserve the vibrant and competitive free market that presently exists for the Internet," "unfettered by Federal or State regulation." 47 U.S.C. §230(b)(2). Congress understood that platforms would "severely restrict the number and type of messages posted" if they were subjected to liability based on the content of the "millions of postings" to their platforms by their "millions of users." *Zeran*, 129 F.3d at 331. So Congress conferred "broad immunity" on internet platforms "for all claims stemming from their publication of information created by third parties." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). Adhering to this clear instruction, this Court "and other circuits have consistently given a wide scope" to

47

Section 230 immunity. *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).

The "central inquiry" under Section 230 is whether the law "treats" the online platform "as a publisher or speaker" of third-party content. *Salesforce*, 123 F.4th at 793. That requires a "functional" analysis, looking to what the duty at issue "actually requires: specifically, whether the duty would necessarily require an internet company to monitor, alter, or remove third-party content." *Id.* at 795 (cleaned up). "If it would, then the [law] is barred by section 230." *Id.* "[I]t does not matter" how a claim or regulation is "style[d]." *Id.* Otherwise, regulators could evade Section 230 by "artfully" drafting local laws "in terms of first-party conduct when they really seek to enforce a duty traditionally associated with publication." *See id.*; *MySpace*, 528 F.3d at 420 (Section 230 "barred" claims based on allegedly inadequate safety measures because they were "merely another way of" holding MySpace liable for its "role as a publisher of online third-party-generated content").

This Court's functional approach to Section 230 is based on a "common-sense reading of [the statute's] text." *Salesforce*, 123 F.4th at 793, 794. It forbids imposing liability whenever an online platform is

48

"treated"—not just formally labeled, tagged, or named—"as the publisher or speaker of any [third-party] information." 47 U.S.C. §230(c)(1). And imposing liability that requires a platform to monitor, screen, or delete content as a practical matter "treat[s]" that platform as a "publisher," and is therefore "inconsistent" with Section 230 immunity. *Id.* §230(e)(1), (e)(3). That approach comports with bedrock preemption principles: when Congress preempts "state or local action [that] is 'inconsistent with'" federal law, it "preempts actions that violate or *circumvent* any of its provisions." *City of Eugene v. FCC*, 998 F.3d 701, 711 (6th Cir. 2021).

Any other approach would violate Section 230's stated purpose "to preserve" a "competitive" and "free" online "market" that is "unfettered by Federal or State regulation." 47 U.S.C. §230(b)(2). Unsurprisingly, many "other federal courts" have also adopted this functional framework, generally "reject[ing] a mechanical approach to the publisher-or-speaker question." *Salesforce*, 123 F.4th at 794, 795.[9]

---

[9] *See, e.g., Force v. Facebook, Inc*, 934 F.3d 53 n.18 (2d Cir. 2019) (Section 230 applies not only to claims where publication "is an explicit element" but also where the duty arises from "*status or conduct* as a publisher" (citation omitted)); *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 524 (4th Cir. 2025) (rejecting "formalistic approach"); *Jane Doe No. 1*, 817 F.3d at 19 (Section 230 preemption "does not depend on the form of the asserted cause of action"); *Gonzalez v. Google LLC*, 2 F.4th

## B.    The 2024 Ordinance Violates Section 230 by Requiring Airbnb to Monitor, Alter, and Delete Third-Party Content.

The 2024 Ordinance violates Section 230 because it "treat[s]" Airbnb "as the publisher or speaker" of third-party "information," 47 U.S.C. §230(c)(1), by imposing on it duties to "monitor[], screen[], and delet[e]" third-party "content," *Salesforce*, 123 F.4th at 798.   The Ordinance's Verification Provision and Booking Transaction Provision each impose those impermissible duties, on pain of substantial penalties. *See* City Code §26-629 (imposing $1,000 minimum penalty for each offense, each day).

The Verification Provision requires Airbnb to "verify the legal eligibility" of short-term rental "listing[s]" that are posted by hosts (*i.e.*, third parties). *See* City Code §26-622(a)(4).  Specifically, listings must be:  (i) "verified *before* any booking transaction is facilitated"; (ii) "reverified *at least* every 30 days"; and (iii) "reverified *whenever* a verifying entity knows or should know that any data it used to complete

---

871, 891 (9th Cir. 2021) (Section 230 applies when "the cause of action inherently requires the court to treat the defendant as the publisher or speaker of content provided by another" (internal quotations omitted)), *rev'd on other grounds, Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023).

the most recent verification has changed." *Id.* §26-622(a)(4) (emphases added). These verification obligations apply even in the absence of any booking activity. The only way to "verify the legal eligibility" of the "listings" is to "monitor[]" their content and "screen[]" them—exactly what Section 230 forbids. *Salesforce*, 123 F.4th at 798. These provisions functionally make Airbnb a guarantor of the veracity and legality of third-party speech in direct defiance of Congress's judgment in Section 230.

The Booking Transaction Provision prohibits Airbnb from "collect[ing] a fee or anything of value in exchange for conducting, facilitating, or completing any booking transaction for a short-term rental … that is not in compliance with" the Ordinance. City Code §26-622(a)(1). That obligation also necessarily forces Airbnb to "monitor[]" and "screen[]" listings in violation of Section 230. *Salesforce*, 123 F.4th at 798. After all, the only way Airbnb can determine whether third-party listings are "in compliance with" the Ordinance, and thus whether it may legally "collect a fee or anything of value" for "facilitating" a transaction involving that listing, City Code §26-622(a)(1), is to "review[]" and "analyz[e]" those listings and their content before any transaction takes

51

place, *Salesforce*, 123 F.4th at 798.  The provision also requires Airbnb to either "alter" or "remove" the offending "third-party content."  *Id.* at 795. As the undisputed record evidence reflects, if the compelled content-monitoring reveals a noncompliant listing, Airbnb's only option is to delete it entirely or change its content (*e.g.*, by flagging it as being unavailable for rent for less than 30 days).  Otherwise, prospective guests would be unable to "differentiate between listings that are actually available to book and those that are not," rendering the platform unusable.  *See* ROA.582.

New Orleans cannot escape Section 230 by artfully drafting the Booking Transaction Provision to be triggered by "collect[ing] a fee or anything of value," City Code §26-622(a)(1), rather than overtly speaking in terms of content moderation.  Congress understood that the platforms it was protecting under Section 230 were for-profit businesses, and Congress did not make the protections of Section 230 contingent on adopting any particular business model.  Thus, courts routinely hold that legal obligations that restrict revenue generation violate Section 230 when the only way to avoid liability is to monitor, alter, or remove third-party content.  *See, e.g., Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 643 (9th

Cir. 2025) (Section 230 barred claim that Twitter "knowingly benefited" from unlawful activity because it "monetiz[ed] … content" through its "advertising structure and other revenue-generating activities," since "the only way for Twitter to avoid the unlawful benefit … would be to remove third-party posts"); *M.P. v. Meta Platforms Inc.*, 127 F.4th 516, 525-26 (4th Cir. 2025) (Section 230 barred tort claims alleging that Facebook allowed "harmful content to appear on its platform … to maximize Facebook's profits," because the claims treated Facebook "as the publisher or speaker of [third-party] information" (cleaned up)); *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 743–44 (9th Cir. 2024) (Section 230 preempted unjust enrichment claim that Meta "profit[ed] by posting fraudulent third-party ads on its website," since "to avoid liability here, Meta … would need to actively vet and evaluate third party ads").

The Booking Transaction and Verification Provisions are each—standing alone—"inconsistent" with Section 230's broad grant of immunity.  47 U.S.C. §230(e)(3).  But when they work together, as intended, the violation is unmistakable.  The Booking Transaction Provision directs that Airbnb may not "collect a fee or anything of value in exchange for" even "facilitating" a noncompliant booking transaction.

53

City Code §26-622(a)(1). And the Verification Provision specifies that Airbnb must "facilitate" compliant "transaction[s]" *by* monitoring and screening "listings" to "verify" their compliance. *Id.* §26-622(a)(4). Indeed, the Verification Provision makes clear that its monitoring and screening requirements exist "*to facilitate* … [compliant] booking transactions." *Id.* §26-622(a)(4)(ii) (emphasis added). In short, this interlocking scheme is expressly designed to force platforms like Airbnb to "monitor[], screen[], and delet[e]" third-party content, on pain of significant penalties. *Salesforce*, 123 F.4th at 798.

Even courts in the Ninth Circuit have enjoined similar short-term rental ordinances under Section 230. A federal district court recently entered a preliminary injunction barring the enforcement of the Clark County, Nevada short-term rental ordinance on Section 230 grounds. *See Greater Las Vegas Short-Term Rental Ass'n v. Clark Cnty.* (*GLVSTRA*), 2025 WL 2608146, at *1 (D. Nev. Aug. 28, 2025). That ordinance—like New Orleans' here—required listings be "verified prior to publication" and "monitored to ensure they contain certain information," and it prohibited platforms from "accept[ing] or facilitat[ing] the payment of consideration in exchange for the use or listing of [an unlicensed] short-

54

term rental." *See* Clark County Code §§7.100.080, 7.100.090. Evaluating these provisions "both individually and combined," the court held that Airbnb was likely to succeed on the merits of its Section 230 claim because the ordinance imposed on Airbnb a "duty to monitor." *GLVSTRA*, 2025 WL 2608146, at *5. Other courts have reached similar results.[10]

### C.     The District Court Misapplied Section 230.

The correct application of Section 230's plain text and this Court's "functional" Section 230 framework to the 2024 Ordinance should have easily resolved this case in Airbnb's favor. But the district court grounded its application of Section 230 on *HomeAway*. That was a twofold error. First, *HomeAway* addressed a fundamentally different ordinance that did not expressly require platforms to verify third-party content. Because the 2024 Ordinance *does* expressly impose that duty, it

---

[10] *See, e.g.*, *Smith v. Airbnb, Inc.*, 316 Or. App. 378, 381-92 (2021) (Section 230 barred claim against Airbnb for "fail[ing] to 'properly vet potential rental listings'"); *Airbnb, Inc. v. City of Boston*, 386 F.Supp.3d 113, 117, 123 (D. Mass. 2019) (preliminarily enjoining portion of ordinance requiring online platforms to "monitor and remove listings"); *La Park La Brea A LLC v. Airbnb, Inc.*, 285 F.Supp.3d 1097, 1107 (C.D. Cal. 2017) (barring claim where "it is with Airbnb's publication of this [listing] content that [the plaintiff] takes issue"); *Donaher, III v. Vannini*, 2017 WL 4518378, at *2 (Me. Super. Ct. Aug. 18, 2017) (barring "claims against Airbnb" for its "decision not to delete a particular posting").

violates Section 230 even under *HomeAway*'s flawed framework. Second, and more fundamentally, both *HomeAway* and the district court's decision are contrary to this Court's "functional" approach to Section 230 immunity, *Salesforce*, 123 F.4th at 793. That analysis considers not only the legal duties that appear on the *face* of an ordinance, but also what an ordinance *actually* requires as a practical matter. The district court—in relying on *HomeAway*—never took that further step.[11]

As to the first error, in *HomeAway*, the Ninth Circuit upheld a municipal ordinance that prohibited short-term rental platforms from "completing any booking transaction for properties not licensed and listed on the City's registry." 918 F.3d at 680, 682-84. That ordinance, unlike New Orleans', on its face did "*not* require … [p]latforms to review the content provided by the hosts of listings on their websites" and thus did "not require … [p]latforms to monitor third-party content." *Id.* at 682. Instead, it prohibited platforms from completing certain booking transactions which the court declined to view as publication activity. *Id.* The court reasoned that "[o]*n its face*, the Ordinance does not proscribe,

---

[11] The district court also cited an out-of-circuit district court case that simply adopted *HomeAway*'s flawed framework. *See Airbnb, Inc.*, 386 F.Supp.3d at 113.

mandate, or even discuss the content of the listings that the Platforms display on their websites." *Id.* at 683 (citing Santa Monica Mun. Code §§6.20.010-6.20.100) (emphasis added). Rather, it determined that the duty "could have been satisfied without changes to content" and that removing certain listings would merely be the "most practical compliance option" from a "business standpoint." *Id.* The court thus concluded that Section 230 did not apply. *Id.* at 682-83.

The district court's reliance on *HomeAway* is untethered from the Ordinance's actual text. Without citing a single provision, it summarily asserted that the Ordinance "simply precludes Airbnb from collecting a fee … for booking [a noncompliant short-term rental] transaction." ROA.296-97. That assertion cannot be squared with the Verification Provision, which expressly requires "[e]ach listing" to be "verified *before* any booking transaction is facilitated," and be "reverified *at least* every 30 days" and "*whenever* a verifying entity knows or should know that any data" has changed. City Code §26-622(a)(4)(i)-(iii) (emphases added). The Verification Provision thus imposes an *active* duty to monitor third-party content that applies repeatedly and continuously—even in the *absence* of booking activity. That easily distinguishes *HomeAway*, where

57

the Santa Monica ordinance imposed no duty to monitor, at least "on its face." *See* 918 F.3d at 682.

The district court's second error was even more fundamental. Beyond being factually inapposite, *Homeaway*'s legal holding cannot be squared with Section 230's text or this Court's precedents. To begin, *HomeAway*'s approach looks nothing like the "functional" framework this Court applies. *HomeAway* expressly limited itself to a superficial inspection of the local ordinance: So long as the ordinance "on its face" seemed focused on the processing of transactions, there was no need to investigate what the Ordinance would practically require. 918 F.3d at 682, 683. Invoking *HomeAway*, the district court posited that "Airbnb may very well determine that for its business model the most effective means of compliance" with the Booking Transaction Provision "will be to review its website so as to remove unpermitted host listings from its site." ROA.926-27. But in the district court's view, that was simply a business choice. So long as Airbnb declined to "collect[] a fee," "profit," or otherwise

operate as a business, it "remain[ed] free … to allow as many unlawful [short-term rental] listings on its website" as it wished.  ROA.926-27.

This Court has "rejected [such] a mechanical approach." *Salesforce*, 123 F.4th at 795.  It has examined what the legal duty "actually requires" to ensure that Section 230 cannot be evaded through "artful" drafting or creative "styl[ing]." *Id.*  The district court never engaged in that analysis, focusing instead on how one part of one provision happens to be *worded*.  *See* ROA.927.  But the only way Airbnb can know whether it is allowed to collect a fee is to *monitor third-party content*—and the district court ignored the undisputed evidence to that effect.  *See supra* section II.B.  In other words, the court focused on how the Ordinance is "style[d]" (a purported regulation of fee collecting) rather than on what it "actually requires" (monitoring, altering, or removing content).  *Salesforce*, 123 F.4th at 795.  It prized form over substance—rewarding precisely the sort of "artful" drafting this Court has previously rejected.  *See id.*

*HomeAway* also contradicts Section 230's text.  *See id.* at 793 (noting that this Court's framework "aligns with [a] common-sense reading of section 230's text" and is "faithful to the text of the statute Congress enacted").  Section 230 forbids liability whenever an online

platform is "treated" as a publisher or speaker of third-party content.  47 U.S.C. §230(c)(1).  To "treat" is "[t]o deal with, behave or act towards." *Treat, Oxford English Dictionary* (2d ed. 1989), https://www.oed.com/oedv2/00256962.  It reflects Congress's concern with how a law or claim actually "deal[s] with" a regulated entity as a practical matter, not just how it words particular legal obligations. *HomeAway* ignores that a platform can be "treated" as a publisher of third-party content even if it is subject to a legal duty that is artfully *phrased* to target revenue generation.

And *HomeAway* failed to take seriously Congress's use of the phrase "inconsistent with" to define Section 230's preemptive scope.  *See id.* §230(e)(3).  That phrase sweeps broadly to invalidate legal obligations that do "not agree[] in *substance, spirit,* or form" with Section 230's grant of immunity.  *Inconsistent, Oxford English Dictionary* (2d ed. 1989), https://www.oed.com/oedv2/00114656.  Under *HomeAway*, Section 230 might have force when a local government openly admits its disagreement with Congress, but leaves untouched regulations that purport to target payment processing even if inconsistent with Section 230 in "substance."

Congress's choice of broad preemptive language requires courts to be alert to such end-runs. A local ordinance is "inconsistent with" federal law if it "circumvent[s] any of its provisions." *City of Eugene*, 998 F.3d at 711. If artful, evasive drafting were all it took to work around Section 230, Section 230 could not achieve its purpose: "to preserve" a "competitive" and "free" online "market" that is "unfettered by Federal or State regulation." 47 U.S.C. §230(b)(2). Under *HomeAway*, Section 230 could be transformed from a protection for a "competitive" and "free" online "market," into a mere privilege reserved for platforms that shun market transactions while doing nothing more than passively host content.

This case makes that crystal clear. The district court here blessed an ordinance that prohibited "collect[ing] a fee or *anything of value* in exchange for conducting, facilitating, or completing" certain online activity. City Code §26-622(a)(1) (emphasis added). The district court reasoned that there was no Section 230 issue because, in its view, booking transactions were distinct from decisions related to the posting of third-party content, and Airbnb could simply "choose" to stop "collect[ing] a fee" associated with booking transactions and not to make any "profit."

ROA.926-27.  Under that mistaken approach, Airbnb can be forced to choose between Section 230 immunity and operating a profit-generating business.  Congress certainly did not limit the protection of Section 230 to non-profits, and courts routinely apply Section 230 immunity to platforms whose business model depends on collecting fees and other revenue through online activities.  *See supra* pp.53-54*; see also, e.g.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 17 (1st Cir. 2016) (recognizing Section 230 immunity despite the platform's "posting fee"); *Green v. Am. Online (AOL)*, 318 F.3d 465, 471-72 (3d Cir. 2003) (recognizing Section 230 immunity for "a fee-based Internet service provider"); *accord Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1120 (9th Cir. 2003).

Consistent with these settled principles, local governments may not impose backdoor content-monitoring obligations under the guise of regulating fees or transactions.  Simply put, a government "cannot do indirectly what [it] is barred from doing directly."  *See Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024).  It is thus no surprise that "other federal courts" have also adopted a "functional" Section 230 framework that "mirrors" this Court's.  *Salesforce*, 123 F.4th at 794.  *See supra* n.9.

Even within the Ninth Circuit, *HomeAway* stands alone when compared to cases that came before and after. For example, in *Barnes v Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009)—decided a decade before *HomeAway*—the Ninth Circuit explained that "what matters is not the *name* of the cause of action" but whether it "inherently requires the court to treat the defendant as the 'publisher or speaker.'" *Id.* at 1102. And in Section 230 cases decided after *HomeAway*, the Ninth Circuit has focused not only on the formal legal duty but on the necessary, practical implications of that duty. *See, e.g.*, *Calise*, 103 F.4th at 743 (considering "*how* Meta would comply with [the relevant] obligation" (emphasis added)); *Doe v. Grindr Inc.*, 128 F.4th 1148, 1153 (9th Cir. 2025) (Section 230 preempted claims because they "necessarily implicate[d] Grindr's role as a publisher of third-party content"); *Twitter*, 148 F.4th at 643 (Section 230 applied because the only practical way for Twitter to "avoid the unlawful [monetary] benefit" that plaintiffs alleged "would be to remove third-party posts—a quintessential publishing activity").

***

New Orleans' restrictions on homeowners' ability to exercise their fundamental rights to offer short-term rentals violate the Takings Clause

63

and Section 230 in spades. Those problems, moreover, are just the tip of the iceberg. The district court characterized Plaintiffs' claims as "sprawling," ROA.882, but the numerous claims Plaintiffs pressed simply reflect the numerous infirmities with New Orleans' effort to ban short-term rentals.

For instance, the 2023 Ordinance is impermissibly vague in violation of due process. No owner could reasonably know whether their conduct conforms with the City's insistence that they provide "adequate light[ing]," prevent "excessive loud noise" and "offensive odors," and avoid "interfer[ing] with neighbors' quiet enjoyment of their properties." ROA.293. Compounding the problems, New Orleans gives hearing officers unfettered discretion to revoke licenses for violating those ambiguous commands—defects the district court never meaningfully addressed, ROA.910. *See McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023). Due process requires far more clarity.

And New Orleans has trampled the privacy rights of Airbnb users. The district court acknowledged that compelling Airbnb to turn over troves of confidential non-public information in monthly reports to the City violates the Fourth Amendment. *See* ROA.921-22. But the

64

Ordinance's verification requirement compounds that problem with another Fourth Amendment violation: it dragoons Airbnb into performing the City's law-enforcement work by verifying hosts' registration status and removing non-compliant listings. *See* ROA.297-98. Whatever merit there is to compelling companies to turn over public-facing information generated in the ordinary course of business, *see* ROA.915; *Smith v. Maryland*, 442 U.S. 735, 742-45 (1979), there is no precedent (let alone one consistent with the Fourth Amendment) for forcing them to gather information they would not otherwise generate—to say nothing of forcing companies to turn around and use that information to facilitate the government's own law-enforcement efforts. *See Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 614 (1989) (Fourth Amendment constrains private actors acting under government compulsion).[12]

---

[12] The district court assumed the City already possessed the relevant information. Not so: only permit holders, *not* applicants, provide that information. Further, Airbnb's expectation of privacy is separate from Host Plaintiffs'. Even if hosts lack a reasonable expectation of privacy in the compelled information, that does "not deprive [*Airbnb*] of the right to claim a reasonable expectation of privacy in [its] business records." *Airbnb, Inc. v. City of New York*, 373 F.Supp.3d 467, 485 (S.D.N.Y. 2019).

The disclosure and verification requirements are also suspect under the First Amendment. Airbnb has the right to decide "both what to say and what *not* to say." *Riley*, 487 U.S. at 795-97. Yet both unduly burdensome requirements force Airbnb to disclose details about hosts—dissemination that is protected by the First Amendment, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *contra* ROA.928-29—that it would not otherwise share. ROA.307-08. That is unconstitutional compelled speech, plain and simple. *E.g.*, *X Corp. v. Bonta*, 116 F.4th 888, 900-03 (9th Cir. 2024).

As these defects (and still others) underscore, the challenged Ordinances are flawed from top to bottom. This Court cannot allow them to remain standing.

## CONCLUSION

This Court should reverse the district court's judgment.

Dated: November 12, 2025                    Respectfully submitted,

                                            s/Paul D. Clement
                                            Paul D. Clement
Sarah E. Harrington                         Andrew Lawrence
David M. Zionts                             Mitchell K. Pallaki
Alexander A. Berengaut                      CLEMENT & MURPHY, PLLC
Daniel G. Randolph                          706 Duke Street
COVINGTON & BURLING LLP                     Alexandria, VA 22314
One City Center                             (202) 742-8900
850 Tenth Street, NW                        paul.clement@clementmurphy.com
Washington, DC  20001-4956
(202) 662-6000


*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I, Paul D. Clement, hereby certify that the foregoing document has been served via the Court's Electronic Case Filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on November 12, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

s/Paul D. Clement
Paul D. Clement

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,969 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.1.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point, Century Schoolbook font.

Dated: November 12, 2025

s/Paul D. Clement
Paul D. Clement

*Counsel for Plaintiffs-Appellants*

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

U.S. Const. amend. I ......................................................................ADD-1

U.S. Const. amend. IV.....................................................................ADD-1

U.S. Const. amend. V .....................................................................ADD-1

47 U.S.C. § 230 ..............................................................................ADD-2

La. Civ. Code Ann. Art. 2678 .........................................................ADD-7

Code of the City of New Orleans § 26-614 (Excerpted) ...................ADD-8

Code of the City of New Orleans § 26-617 (Excerpted) ...................ADD-9

Code of the City of New Orleans § 26-622 (Excerpted) .................ADD-11

Code of the City of New Orleans § 26-624 (Excerpted) .................ADD-15

Code of the City of New Orleans § 26-629 ...................................ADD-16

Code of the City of New Orleans § 54-491.1 (Excerpted) ..............ADD-17

Comprehensive Zoning Ordinance of the City of New Orleans
  § 21.8.C.18 (Excerpted) ..............................................................ADD-18

## U.S. Const. amend. I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## U.S. Const. amend. IV

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## U.S. Const. amend. V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**47 U.S.C. § 230**
**Protection for private blocking and screening of offensive material**

(a) Findings

The Congress finds the following:

(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

(b) Policy

It is the policy of the United States—

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

ADD-2

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

(c) Protection for "Good Samaritan" blocking and screening of offensive material

(1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

(d) Obligations of interactive computer service

A provider of interactive computer service shall, at the time of entering

an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

(e) Effect on other laws

(1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

(2) No effect on criminal law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

(3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4) No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

(5) No effect on sex trafficking law

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—

(A) any claim in a civil action brought under section 1595 of

Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

(B) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of Title 18; or

(C) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of Title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

(f) Definitions

As used in this section:

(1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

(2) Interactive computer service

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

(3) Information content provider

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

(4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

(A) filter, screen, allow, or disallow content;

(B) pick, choose, analyze, or digest content; or

(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

## La. Civ. Code Ann. Art. 2678

The lease shall be for a term. Its duration may be agreed to by the parties or supplied by law.

The term may be fixed or indeterminate. It is fixed when the parties agree that the lease will terminate at a designated date or upon the occurrence of a designated event.

It is indeterminate in all other cases.

## Code of the City of New Orleans § 26-614
## Definitions

Except as otherwise expressly provided in this Article, the following terms and their variant forms shall mean the following:

\*          \*          \*

*"Short-Term Rental"* means the use and enjoyment of a dwelling unit, or any portion thereof, by guests for a period of less than 30 consecutive days, in exchange for money, commodities, fruits, services, or other performances. Hotels, motels, bed and breakfasts, and other land uses explicitly defined and regulated in the Comprehensive Zoning Ordinance separately from short-term rentals are not considered to be short-term rentals.

## Code of the City of New Orleans § 26-617
## Permit and application—Eligibility

(a) No dwelling unit may be used as a short-term rental unit unless an owner possesses a short-term rental owner permit issued in accordance with this article. Issuance of a short-term rental owner permit shall be subject to the following rules and criteria:

(1) Only natural persons age 18 or over may own a property used as a non-commercial short-term rental. Ownership, in whole or in part, by a business entity, trust, or any other juridical person is prohibited.

(2) No person may possess more than one short-term rental owner permit or own, in whole or in part, more than one property used as a non-commercial short-term rental.

(3) A short-term rental owner permit shall be valid for one year from the date of issuance, and shall be reapplied for annually.

(4) A separate short-term rental owner permit shall be required for each dwelling unit used as a short-term rental.

(5) A short-term rental owner permit shall be consistent with the dwelling-unit-per-lot-of-record, guest bedroom, guest occupancy, and any other applicable density limitations set forth in the Comprehensive Zoning Ordinance.

(6) Any dwelling unit permitted for short-term rental use must meet all applicable building, zoning, and addressing regulations, as determined by the department.

(7) An owner of a property with outstanding taxes, fines, fees or penalties levied by the city, or that has been found to be liable of an unabated violation of the City Code by an administrative hearing officer or court shall not be eligible for a short-term rental owner permit with respect to said property.

(8) All juridical owners must be in good standing with the State of Louisiana to be eligible for a commercial short-term rental owner

ADD-9

permit.

(9) An owner of a property with open permits for new construction, structural or non-structural renovation, or electrical or mechanical work, or open violation cases for electrical or mechanical code violations or work without permits, shall not be eligible for a short-term rental owner permit with respect to said property without the written approval of the Chief Building Official of the City of New Orleans or a designee.

(10) The owner or resident of a dwelling unit required to be affordable by the Mandatory Inclusionary Zoning, Voluntary Inclusionary Zoning, Affordable Housing planned Development, or Small Multifamily Affordable Housing provisions of the Comprehensive Zoning Ordinance shall not be eligible for a short-term rental permit for that dwelling unit.

\*        \*        \*

(g) The award of owner permits in zoning districts subject to blockface or per-square caps shall be made using a lottery or other mechanism intended to ensure the equitable distribution of short-term rental permits. The department shall promulgate rules and regulations to set forth the deadlines, application procedures, processes and policies governing this selection procedure and, in doing so, may adopt a weighted lottery using factors to be determined by the department. The duration of a permit may be reduced, and all corresponding fees prorated, to facilitate the implementation of the lottery/equitable distribution system.

\*        \*        \*

ADD-10

## Code of the City of New Orleans § 26-622
## Legal duties of short-term rental platform holders

(a) Any person possessing a short-term rental platform permit shall comply at all times with the following requirements:

(1) No platform may collect a fee or anything of value in exchange for conducting, facilitating, or completing any booking transaction for a short-term rental of a dwelling unit in Orleans Parish that is not in compliance with this article. A short-term rental is not in compliance with this article if (i) the owner of the dwelling unit does not possess a valid short-term rental owner permit for that dwelling unit; (ii) the dwelling unit is not operated by an operator with a valid short-term rental operator permit, or (iii) use of the dwelling unit for short-term rentals would contravene the Code of the City of New Orleans, the Comprehensive Zoning Ordinance, or any other municipal, state, or federal law.

(2) Each platform shall have a duty to obtain commercial general liability insurance, with limits of not less than $1,000,000.00 per occurrence, for bodily injury, personal injury (if commercially available) and property damage arising in any way from the issuance of the short-term rental platform permit or activities conducted pursuant to that permit. Each policy of insurance shall: (i) be issued by an insurer authorized to insure in the State of Louisiana; (ii) name the City of New Orleans as an additional insured on a primary, noncontributory basis for any liability arising directly or indirectly from the issuance of the permit (if commercially available); (iii) be maintained in full force and effect for the duration of the permit period; and (iv) include a provision requiring 30 calendar days' advance notice to the department prior to cancellation or lapse of the policy.

(3) A platform shall ensure that any portal, listing service, or website under its ownership or control that facilitates booking transactions in Orleans Parish complies with the terms and requirements of this article.

ADD-11

(4) A platform must verify the legal eligibility of each booking transaction they facilitate through the city's electronic verification system. Verifications shall be made as follows:

(i) Each listing must be verified before any booking transaction is facilitated.

(ii) Each listing must be reverified at least every 30 days of the prior verification in order to facilitate subsequent booking transactions.

(iii) Each listing must be reverified whenever a verifying entity knows or should know that any data it used to complete the most recent verification has changed, including but not limited to the host's name and the address of the listing.

(5) The short term rental owner or operator must report the address, operator name, owner name, and other details contained on a permit exactly as it appears on the permit to the platform for the listing to be verified through the city's electronic verification system. Deviations in spelling or other information may result in a failed verification and are solely the responsibility of the owner and operator.

(6) Platforms must submit a monthly report to the department, in a form approved by the department, that contains the following information about each of the booking transactions facilitated through the platform during the applicable reporting period:

(i) The total number of short-term rental properties for which booking transactions were facilitated by the platform during the applicable reporting period;

(ii) The total number of exempt lodging business properties for which booking transactions were facilitated by the platform during the applicable reporting period;

(iii) The Universal Resource Locator (URL) links of each

short-term rental and exempt lodging business for which booking transactions were facilitated by the platform during the applicable reporting period;

(iv) The confirmation code verifying eligibility for rental for each booking transaction facilitated by the platform during the applicable reporting period;

(v) The number of booking transactions facilitated for each short-term rental during the applicable reporting period;

(vi) Whether each booking transaction facilitated by the platform was for an entire unit or a partial unit;

(vii) A listing of dates during which the short-term rental was rented as part of a booking transaction facilitated by the platform during the applicable reporting period;

(viii) The amount of rent paid as part of each booking transaction facilitated by the platform for a short-term rental; and

(ix) An accounting of taxes and fees collected and paid by the platform as part of each booking transaction facilitated by the platform.

(7) Upon issuance of a subpoena from the city, provide the following information as specified in the subpoena:

(i) The address of any short-term rental or exempt lodging business listed on the platform for rental;

(ii) The name of the person or entity listing any short-term rental or exempt lodging business on the platform for rental;

(iii) The dates and durations of stays booked through the platform at any short-term rental or exempt lodging business;

ADD-13

(iv) The number of guests and bedrooms specified in the listing at the time of rental;

(v) The number of guests included in the rental, as specified by the renter.

(b) The provisions of Division 4 shall be interpreted in accordance with other applicable state and federal law(s).

**Code of the City of New Orleans § 26-624
Departmental authority**

\*          \*          \*

(k) *Electronic verification system.* The department shall establish an electronic verification system to be used by platforms to verify the legal eligibility of a property for rental before facilitating a booking transaction. The electronic verification system must be able to:

(1) Confirm that the provided address is licensed for short-term rentals or is an exempt lodging business;

(2) Confirm that the party seeking to rent the property through the platform is the licensed owner or operator of the short-term rental or exempt lodging business;

(3) Confirm that the license is current and will not expire before the rental being facilitated will occur;

(4) Provide a unique confirmation code that the verification has occurred; and

(5) Retain all information related to these verifications, including but not limited to the following:

(i) Platform's unique identifier for the property and/or URL of the listing;

(ii) Address of the property being rented;

(iii) Identity of the operator or owner offering the property for rental;

(iv) Confirmation code issued to the platform for the verification.

ADD-15

## Code of the City of New Orleans § 26-629
## Penalties

(a) Any person who violates this article or the Comprehensive Zoning Ordinance shall be subject to a fine of not less than $1,000.00 for each offense. Each day that such violation exists shall constitute a separate and distinct offense. Multiple violations may relate to the same guest stay, day, action, situation, or event, and may be noticed and heard in a single administrative hearing.

(b) In addition to any fine or penalty imposed by this article, the city may seek all available relief in a court of competent jurisdiction to enjoin any violation.

(c) The city may seek any remedy to compel compliance with the requirements of this article or any correlating provision in the Comprehensive Zoning Ordinance, including the discontinuance of electrical service and the filing of property liens.

(d) The city may revoke or suspend any and all permits required by this article, as provided herein. If a permit issued pursuant to this article is revoked, such revocation shall remain in effect for a period of five years from the date of revocation. The duration of suspensions shall be as dictated by the hearing officer's order.

**Code of the City of New Orleans § 54-491.1**
**Penalties**

\*          \*          \*

(b) It shall be unlawful for any person to knowingly offer to rent for monetary compensation for a period of less than 30 days or, in the case of premises located in the Vieux Carré District, 60 days, any living accommodations in the city if the premises offered for rent are not lawfully licensed or permitted for such use. It shall be the duty of any person offering to rent premises in the city for a period of less than 30 days or, in the case of premises located in the Vieux Carré District, 60 days, personally or through another person, to ascertain through the approved list or otherwise, whether or not the property offered for rental is lawfully licensed or permitted for such use.

\*          \*          \*

ADD-17

**Comprehensive Zoning Ordinance of the City of New Orleans**
**§ 21.8.C.18**
**Short Term Rental, Non-Commercial**

\*          \*          \*

i. No person may be the operator of more than one (1) non-commercial short term rental.

\*          \*          \*

k. Only natural persons aged 18 or over may own property used as a non-commercial short term rental. Ownership, in whole or in part, by a business entity, trust, or any other juridical person is prohibited. No person may own, in whole or in part, more than one property used as a non-commercial short term rental.

l. Only one (1) non-commercial short term rental permit shall be issued for each lot.

m. Except as provided in Section 21.8.C.18.r, only one (1) non-commercial short term rental permit may be issued within each city block, inclusive of all lots fronting any exterior boundary or said block and all interior lots not fronting the public right of way.

\*          \*          \*

q. In residential districts and HU-B1A Neighborhood Business District, HU-B1 Neighborhood Business District, HU-MU Neighborhood Mixed-Use District, S-LM Lake Area Marina District, MU-1 Medium Intensity Mixed-Use District, and MU-2 High Intensity Mixed-Use District, only one (1) Accessory Bed and Breakfast, one (1) Principal Bed and Breakfast, or one (1) Non-Commercial Short Term Rental is permitted within each city block, inclusive of all lots fronting any exterior boundary of said block and all interior lots not fronting the public right of way.

\*          \*          \*