No. 25-30524

# In the United States Court of Appeals for the Fifth Circuit

---

BRET BODIN; BRAD NEWELL; DARIAN MORGAN; MICHAEL ROSAS; MID-CITY MIKE RENTALS, L.L.C.; AIRBNB, INC.,
*Plaintiffs - Appellants*,

*v.*

NEW ORLEANS CITY,
*Defendant - Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

---

**REPLY BRIEF FOR PLAINTIFFS-APPELLANTS
BRET BODIN, BRAD NEWELL, DARIAN MORGAN, MICHAEL
ROSAS, MID-CITY MIKE RENTALS, L.L.C., AND AIRBNB, INC.**

---

Sarah E. Harrington
David M. Zionts
Alexander A. Berengaut
Daniel G. Randolph
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC  20001-4956
(202) 662-6000

Paul D. Clement
Andrew Lawrence
Mitchell K. Pallaki
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

January 16, 2026

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

ARGUMENT ................................................................................... 4

I.    New Orleans' 2023 Ordinance Violates The Takings Clause ......... 4

    A.    The 2023 Ordinance Effects *Per Se* Takings ......................... 4

    B.    The 2023 Ordinance Also Effects Regulatory Takings ........ 16

II.   New Orleans' 2024 Ordinance Violates Section 230 ..................... 20

    A.    The City Defends the 2024 Ordinance by Ignoring Its
       Text ................................................................................... 21

    B.    The City's Arguments Defy This Court's Functional
       Approach and Would Circumvent Section 230 ..................... 27

CONCLUSION ............................................................................... 33

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*A.B. v. Salesforce, Inc.*,
123 F.4th 788 (5th Cir. 2024) ......................................................*passim*

*Alford v. Walton Cnty.*,
159 F.4th 844 (11th Cir. 2025) ........................................................ 6, 9

*Baer v. City of Wauwatosa*,
716 F.2d 1117 (7th Cir. 1983)............................................................ 19

*Blakelick Props., LLC v. Vill. of Glen Ellyn*,
2025 WL 3763905 (N.D. Ill. Dec. 30, 2025) ........................................ 17

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) ...................................................... 30, 32

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003)............................................................ 31

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021)....................................................................*passim*

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) .......................................................... 18

*Colony Cove Props., LLC v. City of Carson*,
888 F.3d 445 (9th Cir. 2018).............................................................. 17

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)........................................................................... 10

*First Eng. Evangelical Lutheran Church of Glendale
v. Los Angeles Cnty.*,
482 U.S. 304 (1987)........................................................................... 11

*Greater Las Vegas Short-Term Rental Ass'n v. Clark Cnty.*,
799 F.Supp.3d 1133 (D. Nev. 2025)..................................................... 25

*Green v. Am. Online (AOL),*
  318 F.3d 465 (3d Cir. 2003) ................................................................. 31

*Hawkeye Commodity Promotions, Inc. v. Vilsack,*
  486 F.3d 430 (8th Cir. 2007) ............................................................... 16

*Hignell-Stark v. City of New Orleans,*
  154 F.4th 345 (5th Cir. 2025) ........................................................ 14, 15

*Hignell-Stark v. City of New Orleans,*
  46 F.4th 317 (5th Cir. 2022) ................................................................ 14

*Hodel v. Irving,*
  481 U.S. 704 (1987) ................................................................... 2, 7, 18

*HomeAway.com v. Santa Monica,*
  918 F.3d 676 (9th Cir. 2019) ............................................................... 24

*In re Ultra Petroleum Corp.,*
  943 F.3d 758 (5th Cir. 2019) ............................................................... 13

*Jane Doe No. 1 v. Backpage.com, LLC,*
  817 F.3d 12 (1st Cir. 2016) .......................................................... 30, 32

*Kaiser Aetna v. United States,*
  444 U.S. 164 (1979) ............................................................................ 10

*Kohl v. United States,*
  91 U.S. 367 (1875) ............................................................................... 5

*Lingle v. Chevron U.S.A. Inc.,*
  544 U.S. 528 (2005) ...................................................................8, 16, 17

*Lucas v. S.C. Coastal Council,*
  505 U.S. 1003 (1992) .......................................................................... 20

*Mathis v. United States,*
  579 U.S. 500 (2016) ............................................................................. 8

*NetChoice v. Bonta,*
  790 F.Supp.3d 798 (N.D. Cal. 2025) .................................................. 26

iv

*Nollan v. Cal. Coastal Comm'n,*
   483 U.S. 825 (1987)................................................................ 19

*NYSRPA v. Bruen,*
   597 U.S. 1 (2022)............................................................ 12, 13

*Penn Cent. Transp. Co. v. City of New York,*
   438 U.S. 104 (1978).................................................................. 2

*Rodrigue v. Rodrigue,*
   218 F.3d 432 (5th Cir. 2000)................................................... 5

*Sheetz v. Cnty. of El Dorado,*
   601 U.S. 267 (2024)................................................................. 4

*Slaby v. Mountain River Ests. Residential Ass'n,*
   100 So.3d 569 (Ala. Civ. App. 2012) ................................... 13

*Terrace v. Thompson,*
   263 U.S. 197 (1923)............................................................. 5, 9

*The Civil Rights Cases,*
   109 U.S. 3 (1883)............................................................ 2, 5, 9

*Thomas v. Tex. Dep't of Crim. Just.,*
   297 F.3d 361 (5th Cir. 2002)................................................ 14

*Tyler v. Hennepin Cnty.,*
   598 U.S. 631 (2023)........................................................... 4, 15

*Union Carbide Corp. v. Alexander,*
   679 S.W.2d 938 (Tenn. 1984)................................................. 5

*Webb's Fabulous Pharms., Inc. v. Beckwith,*
   449 U.S. 155 (1980).............................................................. 19

 **Statutes**

47 U.S.C. §230(b)(2)................................................................ 29

47 U.S.C. §230(c)(1)................................................................ 27

47 U.S.C. §230(e)(3) ............................................................................ 27

La. Civ. Code Ann. art. 2678 ................................................................ 5

New Orleans City Code §26-617(g) ...................................................... 18

New Orleans City Code §26-622(a)(1) ............................................. *passim*

New Orleans City Code §26-622(a)(4) ............................................. *passim*

New Orleans Comprehensive Zoning Ordinance §21.8.C.18(*l*) ................. 6

New Orleans Comprehensive Zoning Ordinance §21.8.C.18(m) ............... 6

**Other Authorities**

Jean-Paul Morrell, Remarks, New Orleans City Council Meeting
   (Oct. 10, 2024), https://perma.cc/WQ4BCPX4 .................................... 29

Jed Rubenfeld, *Usings*,
   102 Yale L.J. 1077 (1993) ................................................................ 7

Thomas W. Merrill, *Property and the Right to Exclude*,
   77 Neb. L. Rev. 730 (1998) ............................................................. 10

## INTRODUCTION

New Orleans' submission succeeds only in confirming that its short-term-rental ordinances are constitutionally and legally indefensible. They aim to curtail what, for centuries, was an unencumbered practice of homeowners welcoming guests onto their properties on a short-term basis. But rather than mount a meaningful defense of that history-defying regime, the City—like the district court—disregards controlling precedent and shuns the ordinances' actual text.

Start with the 2023 Ordinance. As the Supreme Court has underscored, government appropriation of or interference with fundamental property rights constitutes a *per se* taking. The rights to lease and to include/exclude are two such fundamental property rights, and the whole point of the Ordinance—which assigns by lottery just *one* short-term-rental permit per block and prohibits anyone from obtaining multiple permits—is to interfere with those rights without providing just compensation. That is unquestionably a *per se* taking and suffices to reverse the decision below. But in all events, the Ordinance's severe restrictions on such core property rights also constitute regulatory takings under the flexible balancing test established by *Penn Central*

*Transportation Co. v. City of New York*, 438 U.S. 104 (1978).

The City's effort to evade these straightforward conclusions goes nowhere. It contends that the appropriation of a fundamental property right is *not* a *per se* taking. But in a long line of cases, the Supreme Court has repeatedly held that it *is*. *See, e.g.*, *Hodel v. Irving*, 481 U.S. 704 (1987). It likewise insists the rights to lease and to exclude/include are *not* fundamental—ignoring express statements from the Supreme Court underscoring that they *are*. *See, e.g.*, *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 153, 158 (2021); *The Civil Rights Cases*, 109 U.S. 3, 22 (1883). As a last resort, the City invokes this Court's rulings in the *Hignell-Stark* cases, though the first addressed a fundamentally different property interest and the second never even mentioned the Takings Clause. The City's contentions regarding *Penn Central* are weaker still. It does not contest the two—most important—factors and has nothing to add on the third (beyond recycling its flawed *per se* takings arguments).

New Orleans fares no better with the 2024 Ordinance, which conscripts Airbnb and other platforms into the law enforcement effort— forcing them to continuously police short-term rental listings for compliance with its harsh regime. By requiring Airbnb and other

platforms to monitor, screen, and alter third-party content, the 2024 Ordinance squarely violates Section 230's federal statutory guarantee of immunity for internet platforms hosting third-party content.

The City answers that argument by studiously *ignoring* the Ordinance's actual text. Nowhere does the City address—or even cite— the Ordinance's verification obligations. Yet those provisions require Airbnb and other platforms to *monthly* and before *every* booking transaction "verify the legal eligibility" of each short-term rental listing. New Orleans City Code [hereinafter City Code] §26-622(a)(4). There is simply no way for platforms to comply with those obligations without monitoring, screening, and altering third-party content on a continuous basis—the exact duties localities cannot impose under Section 230. Nor does the fact that *part* of the Ordinance is *styled* as a prohibition on collecting fees save it from preemption. This Court's controlling Section 230 framework expressly disregards "artful[]" drafting and focuses on what a legal mandate "actually requires." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 793-95 (5th Cir. 2024). Were it otherwise, state and local regulators could circumvent Section 230 with the stroke of a pen. That is precisely what New Orleans has attempted here. Its invalid

circumvention efforts cannot stand.

In the end, the City's arguments, much like its ordinances, show a marked disregard for property owners' fundamental rights and Airbnb's attempt to facilitate their participation in the rich historical tradition of short-term rentals. Against that backdrop, its onerous short-term-rental restrictions plainly violate the constitutional rights of New Orleans property owners and statutory immunity conferred upon Airbnb and other online platforms—several times over. This Court should reverse.

## ARGUMENT

I.  **NEW ORLEANS' 2023 ORDINANCE VIOLATES THE TAKINGS CLAUSE.**

A.  **The 2023 Ordinance Effects *Per Se* Takings.**

As the Supreme Court has made clear, *per se* takings—which require payment of just compensation without exception—occur whenever government appropriates "a fundamental element of the property right," *Cedar Point*, 594 U.S. at 149-50, or "otherwise interfere[s]" with such a right, *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 274 (2024). Courts assess whether a right is a 'fundamental element' of property ownership by reference to "traditional property law principles," "historical practice," and "[Supreme Court] precedents." *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 638 (2023).

4

As Plaintiffs have demonstrated, traditional property-law principles,[1] Supreme Court precedent,[2] longstanding state-law principles,[3] and historical practice, *see* Op.Br.5-9, 22-26, uniformly demonstrate that the right to lease is one such fundamental incident. *See The Civil Rights Cases*, 109 U.S. at 22; *Terrace v. Thompson*, 263 U.S. 197, 215 (1923); *Cedar Point*, 594 U.S. at 149-50. New Orleans could not simply forbid all leasing and limit home ownership to those who can afford to own their homes in fee simple without violating the Takings Clause. Furthermore, Plaintiffs have demonstrated that the right to exclude is another fundamental incident of property ownership, *see Cedar Point*, 594 U.S. at 149-50, and that the right to include is simply its corollary, *see Union Carbide Corp. v. Alexander*, 679 S.W.2d 938, 940 (Tenn. 1984) (property ownership carries several fundamental rights and

---

[1] *E.g.*, La. Civ. Code Ann. art. 2678 (identifying a lease's "term," whose "duration" is set by "the parties," as its core element); *contra* Resp.Br.21.

[2] *E.g.*, *Kohl v. United States*, 91 U.S. 367, 377-78 (1875) (all owners of interests in the property, *including the lessor*, can recover for a taking of the whole parcel).

[3] *E.g.*, *Rodrigue v. Rodrigue*, 218 F.3d 432, 436-37 (5th Cir. 2000) (the "*abusus*—the right to abuse or alienate, i.e., … lease" inheres in "[f]ull ownership of property" under Louisiana law); *contra* Resp.Br.21 (dismissing longstanding state-law principles as irrelevant).

5

the corollary "right to refuse to do any of the[m]"). The City could not force tenants on unwilling homeowners without violating the right to exclude, and it cannot prevent them from hosting guests without violating the corollary right to include.

Through its 2023 Ordinance, however, New Orleans has "wrested the rights" to lease and to include/exclude from Plaintiffs and "t[aken] those rights for itself." *Alford v. Walton Cnty.*, 159 F.4th 844, 854 (11th Cir. 2025). Morgan and Mid-City Mike cannot lease their homes for any period less than a month—*i.e.*, they cannot exercise their right to include tenants for a week without losing their corresponding right to exclude them for the next three. *See* New Orleans Comprehensive Zoning Ordinance §21.8.C.18(m). And Bodin, Newell, and Rosas cannot welcome two (or more) families on their properties for a few days without ceding their right to exclude some of those guests for the balance of the month. *See id.* §21.8.C.18(*l*). New Orleans' appropriation of these fundamental property rights "triggers" the Takings Clause's protections. *Alford*, 159 F.4th at 854.

New Orleans fails to demonstrate otherwise. Like the district court, its primary submission is that *per se* takings cannot occur unless a

6

regulation produces a physical occupation or the loss of all economic value of the property. *See* Resp.Br.15-20. As the City tellingly does not dispute, that proposition would permit it to preclude *any* rentals of *any* length and forbid landowners from allowing *any* guests onto their properties for *any* length of time. But as *Hodel v. Irving* and other authorities underscore, that position is fatally flawed.

*Hodel* squarely held that the government effected a taking by "destroy[ing] 'one of the most essential sticks in the bundle of rights that are commonly characterized as property'"—the "right to pass on property," which has roots stretching back to "feudal times." 481 U.S. at 715-17. *Hodel* thus found a "per se" taking absent either "a physical invasion" or rendering the property valueless, Jed Rubenfeld, *Usings*, 102 Yale L.J. 1077, 1103 (1993)—even when the restriction effected (what the City derisively calls) an "abstract 'appropriation of rights,'" Resp.Br.17-18; *see* Op.Br.33-35. Despite (briefly) acknowledging *Hodel*, *see* Resp.Br.31-32, New Orleans never reconciles that decision with its theory that *per se* takings are triggered only by physical invasions or the loss of all economic value.

Other Supreme Court decisions confirm that *per se* takings are not

7

as limited as the City believes. In *Cedar Point*, for example, the Court explained that the exclusion right "is *a 'fundamental element of the property right'* that cannot be balanced away" and that denying an owner his right to exclude—even if only temporarily—constitutes a *per se* taking. 594 U.S. at 153, 158 (emphasis added) (citation omitted). *Cedar Point* thus contemplated that property contains *multiple* fundamental elements that cannot be appropriated without effecting *per se* takings. *See* Op.Br.34-35. *Lingle v. Chevron U.S.A.* is in accord: While burdensome use restrictions qualify as regulatory takings, "the paradigmatic taking is a direct government appropriation or physical invasion." 544 U.S. 528, 537-39 (2005). The City's asserted physical-or-total-loss limitation on which appropriations trigger the Takings Clause, *see* Resp.19-20, is absent from *Lingle*. *See Mathis v. United States*, 579 U.S. 500, 514 (2016) ("[A] good rule of thumb for reading [Supreme Court] decisions is that what they say and what they mean are one and the same.").

The City protests that Plaintiffs have "distort[ed]" these cases, Resp.Br.17, but other courts disagree. For example, the Eleventh Circuit recently applied *Cedar Point* to a COVID-era ordinance prohibiting

8

landowners from accessing their own private beaches (*i.e.*, exercising a fundamental incident of property ownership) and found a *per se* taking because it temporarily appropriated "the rights to possess, use, and exclude." *Alford*, 159 F.4th at 854. That gives the lie to the City's assertion that, under current doctrine, *per se* takings occur only when a regulation results in "permanent physical occupation" or the "deprivation of all economically beneficial use of property." Resp.Br.20.

Perhaps recognizing its physical-invasion-or-loss-of-all-economic-value theory cannot explain *Hodel* or survive *Cedar Point*, New Orleans next argues that no "fundamental" property rights are at stake here. Resp.Br.21-29. That contention is equally misguided. Though the City claims there is no "longstanding fundamental 'right to lease,'" Resp.Br.21-22, the Supreme Court would beg to differ. For well over a century, it has recognized that the "right to … lease" is a "fundamental right[]," *The Civil Rights Cases*, 109 U.S. at 22, and an "essential attribute[] of property," *Terrace*, 263 U.S. at 215. Remarkably, the City never mentions that longstanding precedent.

The City fares no better insisting that the right to exclude/include is not a fundamental incident of property ownership. *See* Resp.Br.22-24.

9

It cannot meaningfully deny that the right to exclude is a fundamental property right. The Supreme Court has expressly (and repeatedly) recognized as much. *See, e.g.*, *Cedar Point*, 594 U.S. at 150; *Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979); Op.Br.36-37. And its decisions contemplate *per se* takings extending equally to the right to include. *See, e.g.*, *Dolan v. City of Tigard*, 512 U.S. 374, 394 (1994) (inclusion right appropriated when a public easement would prevent the owner from "regulat[ing] the time in which the public entered"). It could hardly be otherwise, as this case well illustrates. Under the 2023 Ordinance, a property owner's decision to voluntarily include paying guests for a weekend necessarily results in his inability to exclude those guests for the remainder of the month. More generally, as the City never disputes, the Supreme Court has repeatedly recognized that the Constitution protects corollary rights, *see* Op.Br.29.n.3; the corollary rights to exclude/include are no different.[4]

---

[4] New Orleans' exegesis of Professor Merrill's scholarship thus is beside the point. *See* Resp.Br.22-24. Regardless, the professor's work speaks for itself: The "right to exclude must encompass … the owner's right to include"—including via "lesser property interests, such as leaseholds"—since property owners hold a "gatekeeper right" that encompasses "exercising the power of exclusion and inclusion." Thomas W. Merrill, *Property and the Right to Exclude*, 77 Neb. L. Rev. 730, 734-44 (1998).

Failing in its fundamental-property-rights argument, the City next posits that there is at least no "longstanding tradition of *short-term* rentals"—and that it can evade the Takings Clause by banning leasing for less-than-one-month periods. Resp.Br.21 (emphasis added). That argument suffers from at least two insuperable problems.

First, the Framers did not excuse temporary confiscations or merely put the government on a shot clock. A temporary taking is still a taking. *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 318-21 (1987). Indeed, that is another of *Cedar Point*'s core lessons. It emphasized that a taking's duration "bears only on the amount of compensation," whereas the appropriation of fundamental property rights (there, the right to exclude) constitutes a *per se* taking, even if "the [challenged] regulation grant[ed] access only to union organizers and only for a limited time." 594 U.S. at 153-54. The Supreme Court conspicuously never discussed the historical pedigree of the specific right to exclude labor organizers or "for up to three hours per day, 120 days per year," *id.* at 143, 149-50; it focused on the deep roots of the general right to exclude.

Second, the premise of the City's argument is wrong. There *is* a

11

longstanding tradition of short-term rentals. "Courts are … entitled to decide a case based on the historical record compiled by the parties," *NYSRPA v. Bruen*, 597 U.S. 1, 25 n.6 (2022), and the historical record here reveals that property owners have rented their homes to others on short-term bases since this Nation's founding. *See* Op.Br.5-9. The City notably offers no competing record. Instead, it dismisses Plaintiffs' numerous historical precedents as "dicta." Resp.Br.22. But that is irrelevant: Whatever their holdings, the cited cases are significant because they indisputably establish that landowners have long leased their properties, often with terms of only weeks or even days. *See supra* pp.5-6 & nn.1-3. That reinforces Plaintiffs' core point that the right to lease (and attendant ability to define its term) is a regularly utilized fundamental property right. Moreover, the absence of holdings reflects the simple reality that, until recently, it never occurred to any jurisdiction in Louisiana—or elsewhere—to tell homeowners they could not follow the centuries-old practice of renting their homes by the week or for a weekend. That hardly helps the City. "[W]hen a challenged regulation addresses" an issue "that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that

problem is relevant evidence that [it] ... is inconsistent with the [Constitution]." *NYSRPA*, 597 U.S. at 26.

Shifting gears, New Orleans asserts that, regardless of any fundamental right to lease residential property, the right is immaterial because this case supposedly concerns "commercial" activity. Resp.Br.24. The City is wrong again. Although all rentals—regardless of duration—generate cashflow, the property use remains residential, not commercial, as nearly 20 other jurisdictions have concluded. *See, e.g., Slaby v. Mountain River Ests. Residential Ass'n*, 100 So.3d 569, 579-80 (Ala. Civ. App. 2012); Op.Br.38.n.6. The City ignores that "monolithic mountain of authority," *In re Ultra Petroleum Corp.*, 943 F.3d 758, 760 (5th Cir. 2019), but those decisions are plainly correct. As the City does not dispute, leasing a house for a year is not commercial activity. Leasing it for an even shorter period—for less money—is not either. There is nothing talismanic about 30 days that alters the residential nature of the property use.

Lacking persuasive arguments on the merits, the City ultimately argues that Plaintiffs' *per se* takings claim is "foreclosed" by this Court's prior decisions in *Hignell-Stark v. City of New Orleans* (*Hignell-Stark I*),

13

46 F.4th 317 (5th Cir. 2022), and *Hignell-Stark v. City of New Orleans* (*Hignell-Stark II*), 154 F.4th 345 (5th Cir. 2025). Resp.Br.24-29. It saves that argument for last for good reason: It is obviously wrong.

*Hignell-Stark I* involved a takings claim where the plaintiffs argued that "they enjoyed property interests in the renewal of their [short-term-rental] licenses." 46 F.4th at 322. Plaintiffs here, by contrast, are not pressing any license-as-property takings theory; they instead contend the City has appropriated their fundamental property rights to lease and to include/exclude. *Hignell-Stark I* did not address those issues and hence cannot foreclose Plaintiffs' *per se* taking claim here, as this Court's precedent makes clear. *E.g.*, *Thomas v. Tex. Dep't of Crim. Just.*, 297 F.3d 361, 370 n.11 (5th Cir. 2002) ("Where an opinion fails to address a question squarely, we will not treat it as binding.").

*Hignell-Stark II* is even further afield. As the City recognizes, *see* Resp.Br.26, it involved a substantive-due-process, not takings, claim. Indeed, it did not even *mention* the Takings Clause. Undeterred, the City claims it "makes little sense" not to treat *Hignell-Stark II* as dispositive. Resp.Br.26. But that overlooks not only this Court's precedent, *see* *Thomas*, 297 F.3d at 370 n.11, but other important principles. *Hignell-*

14

*Stark II* found no "fundamental right to engage in [short-term rentals]" for purposes of its substantive-due-process analysis. 154 F.4th at 353. But that says nothing about the scope of the Takings Clause. Furthermore, *Hignell-Stark II* conducted its substantive-due-process analysis by looking *exclusively* to state law from the last 20 years. Recent practice may rule out a right as fundamental for substantive-due-process purposes, but it does not cut it under the Takings Clause. As the Supreme Court recently admonished, "state law cannot be the only source" of property for takings claims; "the Takings Clause would be a dead letter if [government] could simply exclude from its definition of property any interest that [it] wished to take." *Tyler*, 598 U.S. at 638; *see* Op.Br.36-38 & n.5. The City has no persuasive response to *Tyler*. *See* Resp.Br.14 (citing *Tyler* only to quote the Takings Clause). The *Hignell-Stark* cases thus do nothing to undermine the straightforward conclusion that the 2023 Ordinance effects *per se* takings.

Because the City has not paid just compensation or contemplated a mechanism for doing so, it cannot enforce its restrictions on short-term rentals against Plaintiffs consistent with the Takings Clause.

15

**B.     The 2023 Ordinance Also Effects Regulatory Takings.**

That the 2023 Ordinance effects *per se* takings of Plaintiffs' fundamental property rights suffices to warrant reversal.  Regardless, it also effects a regulatory taking under *Penn Central*, which assesses the economic impact of the short-term-rental ban, its interference with investment-backed expectations, and the character of the government action.  *See Cedar Point*, 594 U.S. at 148.  Plaintiffs easily clear *Penn Central*, *see* Op.Br.39-44, and the City's fleeting response only reinforces the point.

Indeed, this is the rare case where everyone agrees that *Penn Central*'s first two prongs are satisfied.  The district court explicitly held as much, *see* ROA.897, and the City does not argue otherwise on appeal, *see* Resp.Br.30-31.  That is significant.  The Supreme Court has emphasized that the first two *Penn Central* prongs are "[p]rimary" in the regulatory-takings analysis, such that "the *Penn Central* inquiry turns in large part" on those factors, *Lingle*, 544 U.S. at 538-40; *see Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 441-42 (8th Cir. 2007).  That the two "most important" factors are conceded here thus goes a long way toward proving a regulatory taking.  *Colony Cove Props., LLC*

16

*v. City of Carson*, 888 F.3d 445, 454 n.9 (9th Cir. 2018). After all, the entire point of *Penn Central* is to identify regulations that go "too far" when it comes to property rights not treated as *per se* takings—takings where any imposition, no matter how small or temporary, is automatically "too far." *See Cedar Point*, 594 U.S. at 149. It is hard to describe a regulation (like the 2023 Ordinance) that produces concededly severe economic consequences, obliterates concededly legitimate investment-backed expectations, and does so in the context of property rights that are critically important, if not fundamental, as anything other than a regulation that goes too far.

Disregarding that logic, the City addresses only the third and least important *Penn Central* prong—the character of government action. *Lingle*, 544 U.S. at 539 (third factor "may be relevant" in the analysis); *accord Blakelick Props., LLC v. Vill. of Glen Ellyn*, 2025 WL 3763905, at *3-*4 (N.D. Ill. Dec. 30, 2025) (short-term-rental ban likely effected a regulatory taking without addressing last factor). Like the district court, the City mistakenly claims that Plaintiffs have argued only that the regulatory-takings challenge stands or falls with their *per se* challenge. Resp.Br.31. That assertion is no more persuasive in the City's brief than

17

in the decision below. *See* Op.Br.42-44. To be sure, if the Court agrees that the rights to lease and exclude/include are fundamental incidents of property ownership such that any restriction is "too much," there is no need to address *Penn Central.* But if it concludes the rights to lease and exclude/include are subject to some minimal regulation, that these rights are critically important property interests with deep historical roots plainly tips the third prong in Plaintiffs' favor. So too does the "extraordinary" nature of the government action. ROA.533-34; *Hodel,* 481 U.S. at 718. Indeed, New Orleans subjects its residents' property rights to a literal lottery system, *see* City Code §26-617(g), and the *raison d'être* of the Ordinance—as the City has never disavowed—is to stifle economic competition for the "benefit [of] the hotel industry," ROA.905.n.11. Such extraordinary "expense-shifting to a few persons … amounts to a taking." *Cienega Gardens v. United States,* 331 F.3d 1319, 1338-39 (Fed. Cir. 2003).

The City's attempt to evade that conclusion by analogizing its ordinance to "[p]ermitting conditions," Resp.Br.31, goes nowhere. Permitting regimes may have a role to play when the City addresses valid land-use concerns, like nuisance behavior. But localities cannot sidestep

18

the Takings Clause through the simple expedient of reframing traditional property uses as "conditions" of ownership that require owners to register and seek government approval. *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987); *Webb's Fabulous Pharms., Inc. v. Beckwith*, 449 U.S. 155, 164 (1980) (government, "by *ipse dixit*, may not transform private property into public property without compensation").[5]  As the Supreme Court has explained, "'basic and familiar uses of property' are not a special benefit that 'the Government may hold hostage, to be ransomed by the waiver of constitutional protection.'" *Cedar Point*, 594 U.S. at 162.  That perfectly describes the City's impermissible objective here.

Nor does it make any difference that the City deems the 2023 Ordinance a "reasonable restriction[] on the commercial use of

---

[5] This bedrock principle fatally undermines New Orleans' attempt to conflate Plaintiffs' right to engage in a traditional property use (*i.e.*, welcoming third parties on short-term bases) and their interest in City-created short-term-rental permits.  *See* Resp.Br.24, 26, 31-32.  The government may not evade the Takings Clause by forcing property owners to submit to a licensing regime aimed at curtailing disfavored (but traditional) property uses and then denying such licenses on the theory that they are mere "privileges," not "rights."  Resp.Br.32; *see, e.g.*, *Baer v. City of Wauwatosa*, 716 F.2d 1117, 1122 (7th Cir. 1983) ("The state cannot take away your house … by passing a law that homeowners need a license for their homes and then denying you the license.").

residential property." Resp.Br.31. Setting aside that leasing a residential home for a *residential* use is not commercial activity, *see supra* p.13, the City cannot rescue its extraordinary imposition on these grounds. The Ordinance does not merely require property owners to keep records or retain receipts; it categorically prohibits many owners' exercise of their rights to lease or exclude/include altogether. The City does not have *carte blanche* to issue a "legislat[ive] declaration" that short-term rentals are "inconsistent with [the] public interest" and call it a day. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1031 (1992). But that is all that it has done here. Accordingly, while the Court need not address Plaintiffs' regulatory-takings claim if it finds a *per se* taking, the first two prongs of *Penn Central* are conceded, and the third tips decisively in favor of finding a regulatory taking.

## II.   NEW ORLEANS' 2024 ORDINANCE VIOLATES SECTION 230.

The City's attempt to square the 2024 Ordinance with Section 230 is also unavailing. It defends a law that does not exist—insisting that the Ordinance merely regulates booking transactions, not publishing-related duties. But the Ordinance's text tells a different story. When its terms are read as actually written, it unmistakably requires platforms to

20

monitor, screen, and alter third-party content—precisely what Section 230 forbids.

Nor can the City defend the Ordinance by elevating form over substance. This Court's "functional" approach to Section 230 immunity forecloses such end-runs by focusing on what a legal mandate "actually requires," not just how it is "style[d]." *Salesforce*, 123 F.4th at 793-95. Recasting the Ordinance's publishing-related duties as mere restrictions on revenue collection is simply another misguided attempt in a long line of unsuccessful efforts to evade Section 230. Local governments cannot use theories of liability that *purport* to target revenue collection—but *actually* impose publishing-related duties—to sidestep Section 230. A rule, like the Ordinance here, that bans platforms from processing transactions *unless they first monitor third-party content* is preempted just the same.

### A.    The City Defends the 2024 Ordinance by Ignoring Its Text.

The City's brief is full of unsupported assertions about what the 2024 Ordinance does and does not require. But like the district court's decision, *see* Op.Br.57, those contentions are wholly untethered from the Ordinance's text.

The Ordinance, for example, requires platforms to repeatedly "verify the legal eligibility" of each listing "*before* any booking transaction is facilitated"; "at least every 30 days"; and "*whenever* [Airbnb] knows or should know that any data it used to complete the most recent verification has changed." City Code §26-622(a)(4) (emphasis added). The City never addresses or even *cites* these verification obligations, even though they plainly entail "monitoring" and "screening" listings—exactly what Section 230 prohibits. *Salesforce*, 123 F.4th at 798. That blatant omission belies the City's insistence that it "does not require Airbnb to review … any listing." Resp.Br.34-35

The Ordinance likewise prevents Airbnb and other platforms from collecting "anything of value" for "conducting, *facilitating, or* completing" a noncompliant booking transaction. City Code §26-622(a)(1) (emphasis added). But the specific way it demands platforms "*to facilitate …* [compliant] booking transactions" is to repeatedly and continuously "verify the legal eligibility of each" relevant "listing." *Id.* §26-622(a)(4) (emphasis added). So to avoid *facilitating* noncompliant transactions, Airbnb must continuously "monitor[], screen[], and delet[e]" third-party listings. *Salesforce*, 123 F.4th at 798. The City ignores this aspect of the

22

Ordinance in asserting that it "only prohibits" Airbnb and other platforms "from collecting a fee." Resp.Br.34.  The Ordinance's provisions clearly operate in tandem as part of an integrated scheme, which together unambiguously require content monitoring.

Once the actual text of the Ordinance is confronted, the City's house of cards collapses.

*First*, the City claims that Airbnb "is free to have its website cluttered with unpermitted short-term rentals," such that any decision to monitor, screen, or alter content is a mere "business decision." Resp.Br.34.  But that assertion cannot be squared with the Ordinance's text.  As just discussed, it expressly requires Airbnb to "verify" "[e]ach listing" on an ongoing basis and *in advance* of any transaction.  City Code §26-622(a)(4).  The Ordinance also prohibits Airbnb from "facilitating" any noncompliant transaction—and the Ordinance itself makes clear that the way for platforms to facilitate compliant transactions, and to avoid facilitating non-compliant transactions, is to monitor listings.  *Id.* §26-622(a)(1).  The City nowhere explains how a website that is supposedly "cluttered" with noncompliant listings would adhere to those requirements.  *Contra* Resp.Br.34, 36.  The only way to comply with the

Ordinance is to "monitor[]," "screen[]," and "alter" every listing. *Salesforce*, 123 F.4th at 795, 798. Indeed, there is undisputed record evidence to that effect. *See* Op.Br.52; ROA.582.

*Second*, the City contends that the 2024 Ordinance is "like" the Santa Monica ordinance upheld in *HomeAway.com v. Santa Monica*, 918 F.3d 676 (9th Cir. 2019), because it "leaves hosting content undisturbed and instead targets only" noncompliant booking transactions. Resp.Br.37. *HomeAway* is irreconcilable with this Circuit's approach to Section 230. *See* Op.Br.58-63; *see infra* section II.B. But in any event, as the Ninth Circuit made clear, the Santa Monica ordinance prohibited "processing transactions for unregistered properties" but did "*not* require" any platforms "to review the content provided by the hosts of listings on their websites." *HomeAway*, 918 F.3d at 682 (emphasis added). Here, by contrast, the Ordinance *does* require platforms to review third-party content. That is the only way platforms can "verify" that "[e]ach *listing*" is compliant "at least every 30 days" and "whenever a [platform] knows or should know that any data it used to complete the most recent verification has changed." City Code §26-622(a)(4) (emphasis added); *see supra* pp.22-24. In asserting that the 2024 Ordinance is "like

24

the ordinance upheld in HomeAway," Resp.Br.37, the City simply ignores these verification requirements, as well as the express textual linkage of the verification requirements to the duty not to "facilitate" bookings.

*Third*, the City mistakenly asserts (at 35) that the 2024 Ordinance is *un*like the ordinance that was preliminarily enjoined on Section 230 grounds in *Greater Las Vegas Short-Term Rental Ass'n v. Clark County*, 799 F.Supp.3d 1133 (D. Nev. 2025). But the Clark County ordinance—just like the 2024 Ordinance—required platforms to "verify" the compliance of "any [listed] homeowner's short-term rental" and to "remove or deactivate any [noncompliant] listings." *Id.* at 1138. The City asserts that "the 2024 Ordinance does not require that Airbnb verify listings prior to publication," Resp.Br.35, but as discussed, it clearly does, *see* City Code §26-622(a)(4). The City does not bother to address or even cite the relevant part of the Ordinance.

*Fourth*, the City offers a misconceived analogy (at 34-35) to a law requiring a convenience store clerk to confirm a buyer's age before selling alcohol. But again, the 2024 Ordinance—as actually written—is not limited to prohibiting unlawful transactions. It expressly mandates that Airbnb "verify" third-party content on an ongoing basis, City Code §26-

25

622(a)(4), and prohibits Airbnb from even "facilitating" noncompliant transactions by hosting noncompliant content, *id.* §26-622(a)(1). In reality, that duty would look more like an obligation for the convenience store clerk to verify the legal compliance of all labeling on products on its shelves—continually and *in advance* of any transaction.

In the online context (the only context relevant to Section 230 immunity), it would be like requiring an e-commerce platform that sells products from third-party merchants, like Amazon, to confirm that all third-party listings describe and market compliant products *before* any products are actually sold. *See NetChoice v. Bonta*, 790 F.Supp.3d 798, 802 (N.D. Cal. 2025) (holding similar restriction invalid under Section 230). Or like requiring an online platform hosting written posts, like Substack, Medium, or X, to monitor the content they host for defamation before they process or facilitate any subscription fee payment. Or like requiring an online platform that hosts third-parties' funding requests, like GoFundMe, to verify the accuracy of all posts before facilitating any donations. No one would doubt that Section 230 forbids imposing such publishing-related obligations, and they are indistinguishable from the City's ordinance here.

**B.    The City's Arguments Defy This Court's Functional Approach and Would Circumvent Section 230.**

Even if the Ordinance on its face did not *expressly* impose publishing-related duties on platforms (it does), the Ordinance would still violate Section 230.  In the City's view, local laws survive Section 230 preemption whenever they are artfully drafted to impose legal obligations tied to "collecting a fee"—even if those obligations *effectively* require content-monitoring.  *See* Resp.Br.34.  But that approach flouts the language Congress chose in defining the scope of preemption, this Court's "functional" Section 230 framework, and a mountain of precedent holding that Section 230 protects fee-generating activity—not just zero-revenue non-profits.  If the City's view were accepted, regulators could easily circumvent Section 230—and defeat Congress's stated objective—with artful drafting.

The City accepts that this Court's "functional approach" is "controlling," Resp.Br.32, 37—but it fails to faithfully *apply* that framework.  Section 230 provides that no online platform "shall be treated as the publisher or speaker of any information" provided by a third party, and it expressly preempts "any State or local law that is inconsistent" with this principle. 47 U.S.C. §230(c)(1), (e)(3).  The City

27

does not dispute that Congress's preemption language sweeps broadly. *See* Op.Br.46-49. And it accepts that, to give effect to the statute's commands, this Court applies Section 230 immunity through a "functional" lens—considering not just how a legal obligation is "styled," but what the law "actually requires." *Salesforce*, 123 F.4th at 793. A contrary approach would invite regulators to evade Section 230 by "artfully" drafting local laws "in terms of first-party conduct when they really seek to enforce a duty traditionally associated with publication." *Id.*

But that is exactly what the City aims to accomplish here. Because *part* of the 2024 Ordinance is *styled* as a prohibition on "collect[ing] a fee or anything of value," City Code §26-622(a)(1), the City claims that the Ordinance addresses mere "commercial matter[s]" and that—as a result—"Section 230 simply does not apply," Resp.Br.37. The City at the same time ignores what the Ordinance "actually requires." *Salesforce*, 123 F.4th at 795. Its express terms impose a duty to "verif[y]" and "reverif[y]" third-party listings. City Code §26-622(a)(4); *see supra* section II.A. And both the allegations in the complaint and the undisputed record evidence confirm that the only way Airbnb can comply

28

with the Ordinance is to "monitor[]," "screen[]," and "alter" listings. *Salesforce*, 123 F.4th at 795, 798; *see* ROA.301-02, 582. Legislative history further confirms that the City crafted the Ordinance to force Airbnb and other booking platforms to monitor listings and remove any that are noncompliant. *See, e.g.*, Jean-Paul Morrell, Remarks, New Orleans City Council Meeting 3:04:40-3:05:08 (Oct. 10, 2024), https://perma.cc/WQ4BCPX4 (the ordinance will "prevent" short-term rentals "from being listed" and "continually relist[ed]" on platforms). Under this Court's functional framework, *that* "actual[]" requirement— what the City "really seek[s] to enforce"—is dispositive. *Salesforce*, 123 F.4th at 795. It does not matter if the City "artfully" drafted the Ordinance to evade Section 230. *Id.*

Nor can the City force online platforms to choose between preserving Section 230 immunity and generating revenue. Congress did not enact Section 230 as a niche privilege for volunteers willing to host content without generating revenue. Rather, Congress stated expressly that it sought to foster a "competitive free market … for the Internet" that is "unfettered by Federal or State regulation." 47 U.S.C. §230(b)(2). Courts thus properly recognize that platforms' publishing-related

29

activities do not lose Section 230 immunity whenever they involve the collection of revenue.

*Calise v. Meta Platforms, Inc.*, is instructive. There, the plaintiffs brought claims of negligence, unjust enrichment, and unfair competition based on the theory that Meta "generate[d] billions of dollars" in revenue each year by permitting scam ads on Facebook. 103 F.4th 732, 737 (9th Cir. 2024). Even though the plaintiffs' allegations were framed in terms of revenue-generation, the Ninth Circuit held that Meta was immune from the claims because they "derive[d] from Meta's status as a 'publisher or speaker' of third-party ads." *Id.* at 743-44.

Similarly, in *Jane Doe No. 1 v. Backpage.com, LLC*, the plaintiffs attempted to avoid Section 230 by alleging that Backpage.com "profit[ed]" from unlawful activity by charging a "posting fee" before listing certain advertisements online. 817 F.3d 12, 17 (1st Cir. 2016). The First Circuit rejected that theory—and held that Section 230 applied—because the claims "necessarily treat[ed] the website as a publisher or speaker of content provided by third parties." *Id.* at 22. And in *Carafano v. Metrosplash.com, Inc.*, the Ninth Circuit held that Section 230 immunized "a commercial Internet dating service" even though the

30

service had posted the third-party dating profile at issue "[f]or a fee." 339 F.3d 1119, 1121 (9th Cir. 2003); *see also Green v. Am. Online (AOL)*, 318 F.3d 465, 472 (3d Cir. 2003) (holding AOL, "a fee-based Internet service provider," immune for conduct that took place in a chatroom). Plaintiffs cited all of these authorities—and more—in their opening brief. *See* Op.Br.52-53, 62-63. Yet the City fails entirely to address them, much less distinguish them.

Instead, the City advances the sweeping view that Section 230 is irrelevant whenever regulators seek to "restrict online platforms from profiting from illegal activity." Resp.Br.33. But that is just another way of saying that platforms can be held liable for content they did not create—exactly what Section 230 prohibits. The core activity at issue here—renting residential properties on short-term bases to generate additional income for property owners and broaden lodging options for guests—is economically beneficial and constitutionally protected. But even setting that aside, the listings for such short-term rentals are indisputably *someone else's content* that Airbnb is hosting and for which it cannot be held liable. And Section 230 does not permit localities to require online platforms to monitor and take down third-party content

31

because it is unlawful. That rule cannot be evaded simply by saying that the regulator's target is not the third-party content itself, but the platform's "profiting" from that content. From either perspective, the regulatory objective is to impose publishing-related duties on the internet platform. Other courts apply Section 230 as intended, holding that platforms are not liable for generating revenue by hosting someone else's content, even when that content relates to third-party activity deemed unlawful. *See Calise*, 103 F.4th at 743; *Backpage*, 817 F.3d at 22; *Carafano*, 339 F.3d at 1121; *Green*, 318 F.3d at 472. The City never attempts to reconcile its position with those authorities.

The City's sole authority on this issue is *Salesforce*—a decision that outlines the "functional" framework that dooms the City's effort to circumvent Section 230. In that case, the functional analysis resulted in no Section 230 immunity, but for reasons that are easily distinguishable. Section 230 immunity did not apply there because the plaintiffs did not sue a platform that hosted third-party content. Instead, they sued Salesforce, "a company that provided cloud-based software tools and related support services." 123 F.4th at 790-91. But this Court was careful to emphasize that Section 230 immunity "*would likely attach*" if

the plaintiffs had "alleged[] that a defendant knowingly benefitted from [a prohibited] venture by failing to implement adequate content-moderation policies." *Id.* at 798 (emphasis added). That is the very sort of liability that the 2024 Ordinance imposes by requiring Airbnb to engage in particularized "content-moderation"—*i.e.*, monitoring, screening, and altering third-party content—*before* it may "collect a fee or anything of value." City Code §26-622(a)(1). *Salesforce* thus confirms that the Ordinance violates Section 230.

***

As the foregoing demonstrates, New Orleans' ahistorical effort to curtail homeowners' fundamental property rights violates the Takings Clause and Section 230. And as Plaintiffs have explained, the Ordinance *also* flouts several other constitutional provisions—from the First Amendment to the Fourth Amendment to the Fourteenth Amendment. *See* Op.Br.39.n.7, 63-66. The City does not even address the latter deficiencies, apparently conceding them. All roads thus lead to the same conclusion: The Court should reverse the decision below.

**CONCLUSION**

This Court should reverse the district court's judgment.

33

Dated: January 16, 2026

Respectfully submitted,


s/Paul D. Clement

Sarah E. Harrington
David M. Zionts
Alexander A. Berengaut
Daniel G. Randolph
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

Paul D. Clement
Andrew Lawrence
Mitchell K. Pallaki
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com


*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I, Paul D. Clement, hereby certify that the foregoing document has been served via the Court's Electronic Case Filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on January 16, 2026, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

s/Paul D. Clement
Paul D. Clement

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,499 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.1.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point, Century Schoolbook font.

Dated: January 16, 2026

s/Paul D. Clement
Paul D. Clement

*Counsel for Plaintiffs-Appellants*
